**HINSON SNIPES, LLP**

```
Princeton Forrestal Village
116 Village Blvd, Suite 307
Princeton, New Jersey 08540
By: Tracey C. Hinson, Esquire | NJ Attorney ID#: 034542002
Telephone: (609)452-7333 | Fax: (609)452-7332
Attorney for Plaintiff
```

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ELIZABETH McNAIR,** Administrator Ad Prosequendum of the **ESTATE OF DARRELL SMITH,** and **ELIZABETH McNAIR,** Individually,<br><br>    Plaintiff,<br><br>  v.<br><br>**STATE OF NEW JERSEY, DEPARTMENT OF CORRECTIONS, SPECIAL TREATMENT UNIT, ADULT DIAGNOSTIC & TREATMENT CENTER, COMMISSIONER MARCUS O. HICKS,** in his official and individual capacity, **RAYMOND ROYCE,** in his official and individual capacity, **NEW JERSEY DEPARTMENT OF HEALTH, RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY,** d/b/a/ **RUTGERS BIOMEDICAL & HEALTH SCIENCES, UNIVERSITY CORRECTIONAL HEALTH CARE, CHARICE POWELL,** in her official and individual capacity, **GIUSEPPE MANDARA,** in his official and individual capacity, **HENRY ACEBO,** in his official and individual capacity, **OFFICER JAGDAT PERSAD,** in his official and individual capacity, **OFFICER MARZETTIE SHAMBERGER,** in his official and individual capacity, **SGT. FREDDIE RODRIGUEZ,** in his official and individual capacity, **OFFICER JOSE VALENTIN,** in his official and individual capacity, **OFFICER DAMION GILBERT,** in his official and individual capacity, **OFFICER RONY APONTE,** in his official and individual capacity, **OFFICER TIMOTHY FOSTER,** in his official and individual capacity, | Civil Action No.<br>2:21-cv-01291-WJM-CLW<br><br><br>**SECOND AMENDED COMPLAINT**<br><br><br>**DEMAND FOR TRIAL BY JURY, DESIGNATION OF TRIAL ATTORNEY** |

**OFFICER BENNY PEREZ,** in his
official and individual capacity,
**SGT. TIMMIE ORANGE,** in his official
and individual capacity, **ESTATE OF
SGT. PHILIP RILEY,** in his official
and individual capacity, **LT.
ANTONIO COSTEIRO,** in his official
and individual capacity, **LT.
FRANCISCO ESTRADA,** in his official
and individual capacity, **ARTHUR
BREWER,M.D., CCHO,** in his official
and individual capacity, **FRANK A.
GHINASSI, PHD,** in his official and
individual capacity, **JULIE WHITE,
MSW, CCHP,** in her official and
individual capacity, **IHUOMA
NWACHUKWU, M.D.,** in her official
and individual capacity,
**BHARATKUMAR R. PATEL, M.D.,** in his
official and individual capacity,
**BENEDICTA KONAMAH, RN,** in her
official and individual capacity,
**BALMATEE NAIDOO, R.N.,** in her
official and individual capacity,
**YVONNE P. PADEN, R.N.,** in her
official and individual capacity,
**MARIE COLTILDE FLEURANTIN R.N.,** in
her official and individual
capacity, **DELORES GUIDA, R.N.,** in
her official and individual
capacity, **JOHN DOES 1-20, JANE ROES
1-20,** in their official and
individual capacity, and **ABC
COMPANY/ CORPORATION, 1-10)**
(fictitious names),

                    Defendants.

## PRELIMINARY STATEMENT

This case involves the August 2019 tragic and avoidable killing of

decedent **Darrell Smith,** who was beaten to death by New Jersey Department

of Correction Officers. On two separate occasions, several Correction

Officers repeatedly attacked **Mr. Smith** in a gang-style assault. Over the

2

course of several days, **Mr. Smith** was tortured, beaten, kicked, punched, stomped, placed in an illegal chokehold, slammed to the ground, and had his head slammed into a glass door. He was then denied prompt and critical medical care that could have saved his life. As a result of the brutal and unprovoked beatings, massive coverup of the assaults and his injuries, and the deliberate indifference to his serious medical needs, **Mr. Smith** sustained an acute, traumatic, and catastrophic brain injury which caused his tragic and untimely death on August 28, 2019. This clearly inhumane treatment violates basic human dignity and constitutes "cruel and unusual" punishment.

The precipitating event giving rise to the August 23rd through August 26th, 2019 brutal beatings and abuse that killed **Mr. Smith**, was a verbal exchange between **Mr. Smith** and Correction Officers **Charice Powell** and **Guiseppe Mandara** who repeatedly called **Mr. Smith** derogatory names such as a "piece of shit" and a "faggot." The abuse took a macabre turn when Corrections staff illegally shut **Mr. Smith** in Temporary Close Custody Unit/solitary confinement ("TCC") for four days as a rogue punishment, and improperly held him in TCC beyond the 72 hours permitted by regulation, leaving him to decompensate without medical treatment for his serious and severe injuries. During that four-day period, **Mr. Smith** was denied access to the medication, water, and medical care he needed to survive as Correction Officers and medical personnel conspired to conceal the beating and his severe and rapidly deteriorating medical condition.

By the second and/or third day following the brutal attacks on **Mr. Smith** and his illegal TCC/Constant Watch confinement, it was clear **Mr. Smith** had suffered catastrophic injuries from the attacks. Medical records indicate **Mr. Smith** could no longer speak or respond to verbal commands or

tactile stimuli and had grown so weak he could not stand. On August 24th and/or 25th 2019, Correction Officers and medical personnel found **Mr. Smith** unresponsive and propped against a wall, unable to voluntarily move his body or hold his head up. Correction Officers and medical personnel did nothing to assist. Instead, they shook him violently, attempted to lift his arm up which just flopped back to his side, and snatched his shoes off his feet before leaving him helpless, slouched against the wall.

For four days, until EMS was finally called, and **Mr. Smith** was transferred to the hospital, Correction Officers and medical personnel walked by and entered the locked cell without helping him and ignored his obvious and fatally deteriorating state until it was too late. Although medical personnel visited **Mr. Smith** solitary confinement cell, not a single nurse, doctor or other medical provider provided him with medical care or transferred him to the hospital despite his obvious catatonic state. The number of times correction staff, medical personnel and other staff observed **Mr. Smith** while he was in dire circumstances during these four days—doing nothing to assist or aid him—shocks the conscience.

As **Mr. Smith's** body further deteriorated, he urinated, defecated, and vomited on himself. Hour after hour, throughout the mornings, afternoons, and evenings of August 24th, 25th and 26th, Correction Officers, medical staff and others entered **Mr. Smith's** solitary confinement cell to find him lying helplessly on the floor with his head covered with a blanket, lethargic, unresponsive, stiff, filthy, naked, and suffering. Still, no one provided medical care or transported **Mr. Smith** to the hospital to relieve his suffering.

Rather than providing the emergency assistance **Mr. Smith** desperately needed, Correction Officers and medical personnel who could have saved his

life again failed to act, initially unwilling even to touch **Mr. Smith's** body, which was covered with feces, urine, and vomit. Instead of making the obviously necessary interventions, multiple staff members inexplicably watched this man suffer, fanned, and covered their noses because of the stench, then walked away.

Rather than provide the critical emergent care required, Correction Officers and medical staff, who knew **Mr. Smith** could not survive without medical treatment, essentially stood by, and watched as he languished, deteriorated, and ultimately died six days after he was brutally attacked by Correction Officers. Finally, on August 26, 2019, as evening approached, EMS was summoned, and **Mr. Smith** was transported to JFK Medical Center where he arrived unresponsive. By that time, nothing could be done to savehis life. A computed tomography (CT) scan of the head revealed an ischemic stroke, documented as "findings consistent with a large recent left middle cerebral artery [MCA] territory infarct with severe edema and mass effect." He was placed on life support and declared brain dead. **Mr. Smith** was ultimately pronounced dead on August 28, 2019. A "Neuro Critical Care" consultant at JFK opined **Mr. Smith's** stroke likely started during the weekend after the altercations.

<u>**SCOPE OF EMPLOYMENT/RATIFICATION**</u>

1.   **Darrell Smith** died at JFK Medical Center in Edison, New Jersey on August 28, 2019, after he was transported there from the Special Treatment Unit in Avenel, New Jersey August 26, 2019. He arrived in a comatose and unresponsive state.

2.   At the time of the August 2019 brutal physical attacks that led to his tragic and untimely death, **Darrell Smith** was a resident at the Special Treatment Unit and was under the custody, care, and control of the

5

New Jersey Department of Corrections.

3.     **Darrell Smith** did not proximately cause or otherwise contribute to the injuries that led to his death. Instead, **Darrell Smith** died because of injuries deliberately, wantonly, and maliciously inflicted upon him by Correction Officers employed by the New Jersey Department of Corrections and the deliberate failure to provide him with medical care by Correction Officers and medical personnel employed by Rutgers, The State University of New Jersey, d/b/a Rutgers Biomedical & Health Sciences, and University Correctional Health Care.

4.     **Darrell Smith** died because of a deliberate refusal by the individually named Defendants to promptly provide him with the necessary medical care and attention to treat his serious injuries, and/or other life-threatening conditions.

5.     The individuals responsible for **Darrell Smith's** injuries and resulting death were Correction Officers, medical personnel, agents and/or employees of the New Jersey Department of Corrections, New Jersey Department of Health, Rutgers, The State University of New Jersey, d/b/a Rutgers Biomedical & Health Sciences, and University Correctional Health Care, and were, therefore, investigative, Correction Officers, and medical personnel.

6.     The injuries and wrongs constituting the claims set forth herein were perpetrated upon **Darrell Smith** and Plaintiffs by the individual Defendants and/or other presently unknown officers, agents and/or employees of the New Jersey Department of Corrections, New Jersey Department of Health, Rutgers, The State University of New Jersey, d/b/a Rutgers Biomedical & Health Sciences, and University Correctional Health Care, while acting within the scope and in furtherance of their office, agency,

and/or employment, and pursuant to the authorization, either express or implied, of these agencies. The wrongful acts and omissions by the individual Defendants complained of herein were also subsequently ratified, confirmed, and approved by the above agencies.

### NATURE OF THE CASE, JURISDICTION, and VENUE

7.    Plaintiffs brings this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1988, the Eighth and Fourteenth Amendments to United States Constitution, the New Jersey Constitution, the New Jersey Civil Rights Act, N.J.S.A. §§ 10:6-1 to 2, as well as the New Jersey Torts Claim Act, N.J.S.A. 59:1-1, et seq., among other common law and statutory rights.

8.    This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. §§ 1331 and 1343, as one or more causes of action arise under the Constitution, laws, or treaties of the United States, and the amount in controversy exceeds $75,000. Furthermore, this Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as the acts complained of occurred in this district or is the district in which the parties reside.

9.    Plaintiffs seek to vindicate **Mr. Smith's** right to be free from the unlawful use of excessive force, unlawful seizure, unlawful detention, cruel and unusual punishment, deliberate indifference to his serious medical needs, violation of his First Amendment right to free speech, and conspiracy to violate his civil rights. This Amended Complaint alleges that by virtue of their wrongful conduct, each Defendant is liable to Plaintiffs jointly and severally for actual damages, attorney fees, and punitive damages as the Court sees fit.

**THE PARTIES**

10.   **Darrell Smith** (" **Mr. Smith**" or **"Decedent"**), was an African American male and citizen of the United States, who was violently attacked and beaten to death by New Jersey Department of Corrections' Officers at the Special Treatment Unit located at East Jersey State Prison in Avenel.

11.   **Elizabeth McNair ("Ms. McNair")**, is the sister of **Mr. Smith**. She was appointed as Administrator Ad Prosequendum and Limited Administrator of his estate on December 10, 2019.

**NJDOC, STU and ADTC Defendants**

12.   The State of New Jersey, Department of Corrections (**"NJDOC"**), is a public entity that maintains an annual budget of roughly $1 billion; approximately 8,000 employees; 13 correction institutions; and nearly 23,000 state-sentenced offenders housed in prisons, county jails and community halfway houses.

13.   The **NJDOC** has a constitutional duty, under the Eighth Amendment, to provide adequate medical treatment to those in its custody. This is a non-delegable duty.

14.   The Special Treatment Unit **("STU")**, at the East Jersey State Prison in Avenel, and the Adult Diagnostic & Treatment Center **("ADTC")**, located at 8 Production Way, in Avenel, are treatment facilities jointly managed, controlled, and operated by the **NJDOC** and the New Jersey Department of Health (**"NJDOH"**).

15.   The **NJDOC** and the **NJDOH** are responsible for the provision and supervision of medical and mental health care services treatment to residents and inmates confined in State prisons, and through their senior officials, promulgated and implemented policies, including those with

8

respect to the provision of, and access to medical and mental health and other program services mandated by federal and state law.

16.    At all times alleged herein, Defendant **Marcus O. Hicks** ("**Hicks**"), was and remains the Commissioner of the **NJDOC**. As Commissioner of the **NJDOC**, **Hicks** is responsible for the policy, practice, supervision, implementation, and conduct of all **NJDOC** matters, and is responsible for the training, supervision, and conduct of all **NJDOC** personnel, including the individual Defendants named herein. He is sued in his individual and official capacity.

17.    At all times alleged herein, Defendant **Raymond Royce** ("**Royce**"), was the Warden and/or Administrator for the **STU** and/or **ADTC**. He is sued in his individual and official capacity.

18.    The **NJDOC**, **Hicks**, and **Royce** are responsible for the day-to-day operations and supervision of the **STU** and **ADTC**, the development, promulgation, and implementation of policies and procedures related to the custody, safety, and care of inmates and residents, the supervision, hiring, firing, disciplining, training, and oversight of Correction Officers and residents to ensure a safe environment, ensuring Correction Officers and medical staff abide by policies relating to the use of force and the provision of medical care, and are responsible for protecting the rights of residents under the **NJDOC's** custody and supervision. They are being sued for the negligent hiring and retention, and the failure to supervise and train the individual Correction Officers named in the Amended Complaint.

19.    At all times alleged herein, Defendant **Charice Powell** ("**Powell**"), was a Correction Officer employed by the **NJDOC** and assigned to the **STU** between August 23, 2019 and August 26, 2019. She is sued in her

individual and official capacity.

20.   At  all  times  alleged  herein,  Defendant  **Giuseppe  Mandara**
("**Mandara**"),  was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned
to  the  **STU**  between  August  23,  2019  and  August  26,  2019.  He  is  sued  in  his
individual and official capacity.

21.   At  all  times  alleged  herein,  Defendant  **Henry  Acebo**  ("**Acebo**"),
was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned  to  the  **STU**
between  August  23,  2019  and  August  26,  2019.  He  is  sued  in  his  individual
and official capacity.

22.   At  all  times  alleged  herein,  Defendant  **Jagdat  Persaud**
("**Persaud**"),  was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned
to  the  **STU**  between  August  23,  2019  and  August  26,  2019.  He  is  sued  in  his
individual and official capacity.

23.   At  all  times  alleged  herein,  Defendant  **Marzettie  Shamberger**
("**Shamberger**"),  was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned
to  the  **STU**  between  August  23,  2019  and  August  26,  2019.  He  is  sued  in  his
individual and official capacity.

24.   At  all  times  alleged  herein,  Defendant  **Sgt.  Freddie  Rodriguez**
("**Sgt.  Rodriguez**"),  was  a  supervising  Sergeant  employed  by  the  **NJDOC**  who
was  assigned  to  and/or  was  on  duty  at  the  **STU**  or  **ADTC**  from  August  23,  2019
thru  August  26,  2019.  He  is  sued  in  his  individual  and  official  capacity.

25.   At  all  times  alleged  herein,  Defendant  **Jose  Valentin**
("**Valentin**"),  was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned
to  the  **STU**  between  August  23,  2019  and  August  26,  2019  He  is  sued  in  his
individual and official capacity.

26.   At  all  times  alleged  herein,  Defendant  **Damian  Gilbert**
("**Gilbert**"),  was  a  Correction  Officer  employed  by  the  **NJDOC**  and  assigned

to the **STU** between August 23, 2019 and August 26, 2019. He is sued in his individual and official capacity.

27. At all times alleged herein, Defendant Officer **Rony Aponte** (**"Aponte"**), was a Correction Officer employed by the **NJDOC** and assigned to the **STU** between August 23, 2019 and August 26, 2019. He is sued in his individual and official capacity.

28. At all times alleged herein, Defendant **Timothy Foster** (**"Foster"**), was a Correction Officer employed by the **NJDOC** and assigned to the **STU** between August 23, 2019 and August 26, 2019. He is sued in his individual and official capacity.

29. At all times alleged herein, Defendant **Benny Perez** (**"Perez"**), was a Correction Officer employed by the **NJDOC** and assigned to the **STU** between August 23, 2019 and August 26, 2019. He is sued in his individual and official capacity.

30. At all times alleged herein, Defendant **Sgt. Timmie Orange** (**"Orange"**), was a first shift supervising Sergeant employed by the **NJDOC** who was assigned to and/or was on duty at the **STU** or **ADTC** from August 23, 2019 thru August 26, 2019. He is sued in his individual and official capacity.

31. At all times alleged herein, Defendant **Sgt. Philip Riley, by way of his Estate (Estate of Philip Riley)**, collectively **"Riley"**, was a supervising Sergeant employed by the **NJDOC** who was assigned to and/or was on duty at the **STU** or **ADTC** from August 23, 2019 thru August 26, 2019. He is sued in his individual and official capacity, by way of his Estate.

32. At all times alleged herein, Defendant **Lt. Antonio Costeiro** (**"Costeiro"**), was a supervising Lieutenant employed by the **NJDOC** who was assigned to and/or was on duty at the **STU** or **ADTC** from August 23, 2019

11

thru August 26, 2019. He is sued in his individual and official capacity.

33.   At all times alleged herein, Defendant **Lt. Francisco Estrada** (**"Estrada"**), was a unit shift supervisor employed by the **NJDOC** who was assigned to and/or on duty at the **STU** or **ADTC** from August 23, 2019 thru August 26, 2019. He is sued in his individual and official capacity.

34.   Defendants **Powell, Mandara, Acebo, Persad, Shamberger, Sgt. Rodriquez, Valentin, Gilbert, Aponte, Foster**, and **Perez**, were theCorrection Officers who physically attacked, assaulted, battered, used unlawful and excessive force, and committed the complained of violations that killed **Mr. Smith**, and who supervised, conspired, planned, observed, lied, falsified documents, coerced witnesses, tampered with, withheld or destroyed evidence, gained knowledge of, denied medical care, and/or failed to intervene to prevent the horrific and brutal physical assaults, and unlawful use of excessive force, and denial of medical care to **Mr. Smith** despite ample opportunity to do so.

35.   Defendants **Royce, Sgt. Rodriquez, Sgt. Orange, Sgt. Riley, Lt. Costeiro**, and **Lt. Estrada**, were the Supervisors of **Powell, Mandara, Acebo, Persad, Shamberger, Valentin, Gilbert, Aponte, Foster**, and **Perez**, who were either present during both assaults, participated in the attacks, and/or had actual knowledge of the assaults, **Mr. Smith's** rapidly deteriorating medical condition and the denial of medical care to **Mr. Smith**, and who failed to supervise, train, discipline the Correction Officers who brutally attacked **Mr. Smith**, conspired with each other, planned, observed, lied, falsified documents, coerced witnesses, tampered with, withheld or destroyed evidence, gained knowledge of and/or failed to intervene to prevent the horrific and brutal physical assaults, unlawful use of excessive force, and the denial of critical medical care to **Mr. Smith**

despite having ample opportunity to do so.

36.   At all times alleged herein, Defendants, **John/Jane Does 1-20** (fictitious names whose identities are presently unknown) were Deputy Superintendent for Security, Correction Officers, Sergeants, Lieutenants, Supervisors, Wardens, Chiefs, Commissioners, Directors, Majors, Captains, and any other individuals, who were acting in the capacity of agents, servants, and employees, representatives, or agents of the **NJDOC**, **NJDOH**, **STU**, and **ADTC**, within the scope of their employment, and who either participated in the brutal physical assaults, failed to intervene to prevent the unlawful use of excessive force and denial of critical medical care to **Mr. Smith** despite ample opportunity to do so, or whose actions assisted and/or contributed to the unlawful, unconstitutional, and tortious conduct that result in the beating death of **Mr. Smith.**

37.   The individually named Correction Officers who were involved in the abuse and beating death of **Mr. Smith** and the violation of his constitutional rights are referred to collectively as the "**Assaulting Officers.**"

38.   The individually named Supervisors are collectively referred to as the "**Supervising Defendants.**"

**Medical Provider Defendants**

39.   At all times alleged herein, Rutgers, The State University Of New Jersey, d/b/a Rutgers Bio-Medical and Health Sciences, otherwise known as University Correctional Health Care ("**UCHC**"), is an entity of the State of New Jersey established in 2005 through inter-State agency agreements. **UCHC** and its medical team provides medical, mental health, and dental treatment to residents, inmates, and parolees at State Correction facilities, including the **STU** and the **ADTC.**

13

40.   **UCHC** operates with a budget of approximately $175 million and approximately 1,100 staff serving roughly 20,500 inmates in twelve adult correction facilities, 400 residents in fourteen JJC locations, and 1,000 individuals in ten state parole board offices. **UCHC's** mission statement states "[w]e are committed to being a leader in the delivery of effective, compassionate and accessible care informed by research within correctional environments. We Care. We Teach. We Heal. We Improve."

41.   At all times alleged herein, Defendant **Frank A. Ghinassi, PhD**, ("**Ghinassi**"), was the President and Chief Operating Officer of **UCHC**. He is sued in his individual and official capacity.

42.   At all times alleged herein, Defendant **Arthur Brewer, M.D., CCHO, ("Brewer")**, was the Medical Director of **UCHC**. He is sued in his individual and official capacity.

43.   At all times alleged herein, Defendant **Mechele Morris, PhD, CCHP ("Morris")**, was the Director of Training of **UCHC**. She is sued in her individual and official capacity.

44.   At all times alleged herein, Defendant **Julie White, MSW, CCHP ("White")**, was the Chief Operating Officer of **UCHC**. She is sued in her individual and official capacity.

45.   At all times alleged herein, Defendant, **Ihuoma Nwachukwu, M.D.,** ("**Nwachukwu**"), was **Mr. Smith's** treating physician at the **STU** or **ADTC** and was the Supervising Physician and/or Regional Medical Director responsible for the supervision and training of **UCHC's** nurses and medical professionals responsible for the care, treatment, and diagnosis of **Mr. Smith** on August 23rd through August 26, 2019. She is sued in her individual and official capacity.

46.   At all times alleged herein, Defendant **Bharatkumar R. Patel,**

14

M.D., was **Mr. Smith's** treating physician at the **STU** or **ADTC** and was responsible for the supervision and training of **UCHC's** nurses and medical professionals responsible for the care, treatment, and diagnosis of **Mr. Smith** on August 23rd through August 26, 2019. He is sued in his individual and official capacity.

47. At all times alleged herein, Defendant **Delores A. Guida, R.N.** ("**Guida**"), was **UCHC** nurse manager assigned responsible for the care, treatment, and diagnosis of **Mr. Smith** on August 23rd through August 26, 2019. She is sued in her individual and official capacity.

48. At all times alleged herein, Defendants **Balmatee Naidoo, RN,** ("**Naidoo**"), **Yvonne P. Paden, RN.** ("**Paden**"), **Marie Fleurantin, RN** ("**Fleurantin**"), and **Benedicta Konamah, RN,** ("**Konomah**"), were medical personnel and staff nurses employed by **UCHC** and assigned to the **STU** or **ADTC**, who were responsible for the care, treatment, and diagnosis of **Mr. Smith** on August 23rd through August 26, 2019. They are sued in their individual and official capacities.

49. At all times alleged herein, Defendants **Jane Roes 1-20** (fictitious names whose identities are presently unknown), were medical personnel including but not limited to health service directors, physicians, physician assistants, nurses, nurse administrator(s), nurse practitioners, nurse's assistants, social workers, and mental health clinicians, who were acting in the capacity of agents, servants, employees, or representatives of the **NJDOC, NJDOH, STU, ADTC,** and **UCHC**. They were responsible for the provision of appropriate medical and mental health care to patients at the **STU** and **ADTC**, including **Mr. Smith**. They are sued their individual and official capacity.

15

50.   At all times alleged herein, **Ghinassi, Brewer, Morris**, and **White**, were responsible for the hiring, retention, supervision, andtraining of **UCHC's** medical professionals, including **Nwachukwu, Patel, Konamah, Naidoo, Paden, Fleurantin**, and **Jane Roes 1-20,** and wereresponsible for supervising **Mr. Smith's** health care to ensure he had accessto timely and appropriate medical treatment on August 23-26, 2019.

51.   At all times alleged herein, Defendant **ABC Company/ Corpora**tion, 1-10 (fictitious names whose identities are presentlyunknown), contracted with the **NJDOC, NJDOH,** and/or **UCHC** to provide medicaland mental health services to residents and prisoners in State facilities,including the **STU** and the **ADTC.**

52.   At all times relevant, the individually named Defendants, acted under the color of state law, and incident to the pursuit of their duties as officers, employees, agents, or representatives of the **NJDOC, NJDOH, STU, ADTC,** and **UCHC** in engaging in the conduct described herein.

53.   This Complaint alleges that each Defendants, by virtue of their wrongful conduct, are liable to Plaintiffs jointly and severally for actual and compensatory damages, attorney fees, costs, punitive damages, and other damages as the Court sees fit.

54.   The individually named medical professionals, medical providers, and health care agency(s) are collectively referred to as the "**Medical Defendants.**"

## COMPLIANCE WITH NEW JERSEY TORT CLAIMS ACT

55.    A timely Notice of Claim was served upon the State of New Jersey, Department of Treasury on September 30, 2019, and on Rutgers, TheState University Of New Jersey, d/b/a Rutgers Bio-Medical and Health Sciences, otherwise known as University

Correctional Health Care (**"UCHC"**), via certified mail, return receipt requested on September 15, 2020.

## FACTUAL ALLEGATIONS

### The Beatings, Torture, and Homicide of Darrell Smith

56.   On August 23, 2019, at approximately 7:05 to 7:20 a.m., the **Assaulting Officers** participated in an unlawful, unprovoked, brutal, and deadly gang-like beating of **Mr. Smith**.

57.   The **Assaulting Officers** repeatedly beat, kicked, punched, stomped, placed **Mr. Smith** in an illegal chokehold, slammed him to the ground, and slammed his head into a glass door.

58.   As a result of the brutal, unprovoked beatings and the deliberate indifference to his serious medical needs, **Mr. Smith** sustained an acute, traumatic, and catastrophic brain injury which caused his tragic and untimely death on August 28, 2019.

59.   The precipitating event giving rise to the horrific beating death of **Mr. Smith** was a verbal exchange between **Mr. Smith** and Defendants **Powell** and **Mandara** on August 23, 2019, during which **Powell** and **Mandara** repeatedly hurled insults at **Mr. Smith**, threatened him with bodily harm, and called him derogatory names such as a "piece of s..t" and a "f  t."

60.   This unavoidable tragedy occurred during the morning meal when **Powell** and **Mandara** accused **Mr. Smith**, who worked in the kitchen at the **STU**, of stealing left-over breakfast food items, specifically peanut butter, and bananas. **Mr. Smith**, a young and healthy 50-year-old man, was attacked and beaten to death by the **Assaulting Officers** over left-over peanut butter and bananas.

61.   According to multiple eyewitnesses, after serving breakfast to the residents, **Mr. Smith** asked a resident to bring some left-over peanut

butter and bananas to his room on the West Unit while he continued to clean

the kitchen area.

62.   When **Powell** saw the resident bringing the tray to **Mr. Smith's** room, she yelled to him: "Stop. Don't put that in there, bring it down here." Powell directed the resident to place the tray on her desk. She then entered **Mr. Smith's** room and removed his breakfast which she then distributed to residents.

63.   Shortly thereafter, **Mr. Smith** left the breakfast area to return the food cart to kitchen. According to witnesses, as he walked past **Powell's** desk, he stopped and attempted to retrieve the food trays from **Powell's** desk to return them to the kitchen.

64.   Unprovoked, **Powell** loudly yelled "Get away from my desk. Get away from the desk. Get the f...k away from my desk."

65.   **Powell** continued to verbally assault **Mr. Smith**, calling him a "thief" and a "f....t," which she repeated, apparently in response to a comment from **Mr. Smith**, by stating, "You like little boys right? So, you a f....t!" Witnesses report she also threatened his life.

66.   Several witnesses report seeing, and hearing, **Powell** verbally abuse and use abusive language towards **Mr. Smith** on multiple prior occasions, calling him a "homo," "homosexual ass," "f... t," and "...y rapist."

67.   These witnesses state it was clear **Powell** hated **Mr. Smith** and long "had it in for him." Prior to his beating death, **Mr. Smith** told a group therapist at **STU** that **Powell** had threatened his life.

68.   **Mr. Smith** also repeatedly complained to his sister Elizabeth that **Powell** constantly harassed and verbally abused him. Just four days before the brutal attacks instigated by **Powell** that killed him, **Mr. Smith** told his sister that **Powell** verbally assaulted him and called him foul names. That was the last time Elizabeth spoke to her brother.

19

69.   According to witnesses, **Powell** exhibits a deep lack of respect for residents and frequently tells them to: "Write it up I don't give a f... k," when they complained about her mistreatment.

70.   Upon information and belief, **Powell** has been "written up" multiple times because of the hatefulness, verbal abusive language, and lack of respect she exhibits toward residents.

71.   In fact, it appears **Mr. Smith** horrific beating death had no impact on **Powell** and did not change her behavior toward residents. Residents reported **Powell**, along with **Persad**, **Shamberger**, **Sgt. Orange**, and other unknown Correction Officers bragged about killing **Mr. Smith**. In fact, **Sgt. Orange** told residents **Mr. Smith** was dead even before he was transported to the hospital on August 26, 2019.

72.   **Powell** was reassigned immediately following the beating death of **Mr. Smith**. She recently returned to the same unit but was removed or transferred in less than an hour after residents reported her continued abusive behavior the same day she returned to the unit and expressed they felt threatened, feared retaliation for speaking out about **Mr. Smith's** death, and feared for their lives.

73.   In response to **Powell's** verbally abusive and derogatory comments, **Mr. Smith** apparently muttered under his breath and continued to the kitchen with the food cart. After returning the food cart to the kitchen, **Mr. Smith** began to walk back to the West Unit. As he walked past **Powell** and **Mandara's** desk, he allegedly stated words to the effect, "You can't go into my room and just take stuff out of my room."

74.   Eyewitnesses report **Mandara** became enraged, left his desk, walked toward **Mr. Smith**, and repeatedly yelled, "So what you're a thief. You're a f..king thief, a f..king thief."

20

75.   Upon information and belief, **Mr. Smith** responded to **Mandara** by stating words to the effect that "since breakfast was over, he could not be stealing."

76.   **Mr. Smith** continued toward the entrance door to the West Unit, with **Mandara** following closely behind him, repeatedly yelling the vilest insults and threats at **Mr. Smith**, including "you're a mother. . .king h..o." "You dumb ass b…tch." "You're a piece of shit." "Your "mother is a piece of shit." "What are you gonna do," and "I'll f... k you up."

77.   Witnesses report **Mr. Smith**, who is extremely soft spoken, said words to the effect, "I don't disrespect you at all I don't speak to you," to **Mandara** and continued walking toward the exit for the West Unit, in an effort to get out of harm's way.

78.   **Mandara** became increasingly enraged. He ran back to his desk, removed his utility belt, threw it on the chair in front of his desk, and pursued **Mr. Smith** approximately 15-20 feet from his desk to the West Unit entrance door, shouting "what you gonna do you piece of shit. You're a piece of shit." "Come on I will f..k you up." "I'll f...k you up, you piece of shit."[1]

79.   Multiple witnesses saw **Mandara** tackle and push **Mr. Smith** into the hallway between the inner and outer door to the West unit, pressing **Mr. Smith** against the wall, and slamming his head into the thick glass of the door, before tackling him to the ground. As **Mr. Smith** laid prone on the ground, **Mandara** continued to pummel him, repeatedly punching him in

---

[1] According to witnesses, this was not the first time Correction Officers, including **Powell** and **Mandara**, threatened residents on the West Unit with physical violence.

his back, head, and ribs, as he screamed, "I'll f..k you up you asshole" and "I'll beat the shit out of you."

80.   According to witnesses, at that point, **Powell** sounded an alarm, "Code 33 west officer involved," which requires Correction officers to arm themselves with riot helmets, shields, and batons to quell a disturbance. She then yelled, "Lock in! Everyone, lock the f... k in now!"

81.   After code was called, several Officers, including, but not limited to, **Powell, Acebo, Persad, Shamberger, Sgt. Rodriquez, Valentin, Aponte, Gilbert, Foster, Perez**, and **John Does 1-20**, arrived and immediately joined in the brutal physical attack on **Mr. Smith** such that they placed him in an illegal chokehold, grasped, manhandled, shoved, dragged, and body slammed **Mr. Smith** to the ground. The **Assaulting Officers** repeatedly stomped, punched, and kicked **Mr. Smith** in his back, head, face, legs, ribs, and sides, as he lay prone and helpless on the ground.

82.   To coverup and shield their vicious and deadly attack on **Mr. Smith** from residents and from being caught on camera, the **Assaulting Officers** dragged him to an area behind a pole which was a blind spot for cameras.

83.   Despite their best efforts and conspiracy to conceal the brutal physical assaults, the interactions between **Powell, Mandara**, and **Mr. Smith** as well as the brutal assaults were caught on video.

84.   Defendants **Mandara, Powell, Acebo, Persad, Shamberger, Sgt. Rodriquez, Valentin, Gilbert, Aponte, Foster, Perez**, and some John Does personally struck **Mr. Smith**.

85.   Other **John Does** were present during the brutal physical assault and failed to intervene or protect **Mr. Smith**. Upon information and belief,

at least one **John Doe** restrained **Mr. Smith** while the **Assaulting Officers** beat him.

86.   After physically assaulting **Mr. Smith**, and in furtherance of their conspiracy to conceal the true nature of the incident, **Powell**, the **Assaulting Officers**, and **Supervising Defendants** conspired and agreed to fabricate a report where **Powell** falsely stated **Mr. Smith** assaulted her.

87.   After physically assaulting **Mr. Smith**, and in furtherance of their conspiracy to conceal the nature of and severity of **Mr. Smith's** injuries, the **Assaulting Officers** and **Supervising Defendants** refused to call for medical assistance, despite knowing the severity of **Mr. Smith's** injuries and despite knowing that the denial of medical care would have potentially life-threatening implications and deadly ramifications for **Mr. Smith.**

88.   After physically assaulting **Mr. Smith**, the **Assaulting Officers** and their immediate supervisors forced him to walk to the **STU** infirmary. The walk from the West Unit to the infirmary is extensive and meanders down a long outdoor pathway. This was done in retaliation and to cause further injury, pain, suffering, and humiliation to **Mr. Smith.**

89.   To further punish **Mr. Smith** for his perceived disrespect, **Lt. Estrada** ordered **Sgt. Rodriquez** to unlawfully lock **Mr. Smith** in TCC/Constant Watch, D-Wing, cell #8, without due process.

90.   **Mr. Smith** was confined to the D-Wing, cell #8, on TCC/Constant Watch without legal authority and contrary to **NJDOC** rules and regulations without any opportunity to contest his unauthorized lock-in and the attendant deprivations of liberty.

91.   Upon information and belief, UCHC nurse **Konomah** and/or **Naidoo**, wrote and/or fabricated a report which claimed **Mr. Smith** was stable and fit for transfer to the TCC/Constant Watch confinement cell.

### The Second Physical Assault

92.   The **Assaulting Officers** physically assaulted **Mr. Smith** a second time between Friday, August 23rd and Monday, August 26th, 2019, while he was in the D Unit, TCC/Constant Watch and/or the infirmary.

93.   The **Assaulting Officers** placed **Mr. Smith** in an illegal chokehold and repeatedly kicked, punched, slammed, stomped, and struck various parts of his body, including his head, with their fists and hands. This time, the brutal attack caused catastrophic injuries that left him in an unresponsive and catatonic state.

94.   Once again, to coverup and shield their actions from being caught on camera, the **Assaulting Officers** viciously attacked **Mr. Smith** in an area of the D Unit which was a blind spot for cameras.

95.   The physical assaults on **Mr. Smith** were so brutal, he involuntarily defecated, urinated, and vomited on himself.

96.   Once again, **Sgt. Rodriquez** escorted **Mr. Smith** to the Medical Annex where he was evaluated for TCC/Constant Watch a second time by Defendant nurse **Naidoo**.

97.   From approximately 7:30 a.m. on Friday, August 23rd until approximately 5:21 p.m., on Monday, August 26th, 2019, the **Assaulting Officers**, their immediate supervisors, and the **Supervising Defendants** kept **Mr. Smith** locked inside the TCC/Constant Watch D-Unit cell apparently to teach him a lesson for the "offense" that his objection to being called a "thief" and a "f....t" and being subjected to vilest of insults caused.

24

98.   Despite the severity of his injuries, **Mr. Smith** received no medical treatment whatsoever at the infirmary or while locked in TCC/Constant Watch, leaving him to decompensate without medical treatment for his serious and ultimately fatal injuries.

### Deliberate Indifference Serious Medical Needs:

99.   After brutally attacking **Mr. Smith**, the **Assaulting Officers** and their immediate supervisors, including **Royce, Sgt. Rodriquez, Sgt. Orange, Sgt. Riley, Lt. Costeiro, Lt. Estrada,** and **John Does 1-20,** again locked him in TCC/Constant Watch, denied him critical medical care, and left him comatose and lying his own waste for four days.

100.   During that four-day period, **Mr. Smith** was denied access to the medication, water, and medical care that he needed to survive as Correction Officers and medical staff conspired to conceal the beatings and his serious medical condition.

101.   By the second or third day following the brutal assaults illegal confinement, it was evident **Mr. Smith** had suffered catastrophic injuries during the attacks. **Mr. Smith** could no longer speak or responded to verbal commands or tactile stimuli and had grown so weak he could not stand.

102.   Although Corrections and medical staff visited **Mr. Smith** TCC/Constant Watch confinement cell, not a single nurse, doctor or other medical provider, or Corrections staff, provided him with medical care or transferred him to a hospital despite his obvious deteriorating medical condition and catatonic-comatose state catatonic state.

103.   On or about August 25, 2019, Corrections, and medical staff, including **R.N. Paden**, found **Mr. Smith** propped against a wall in an unresponsive and catatonic-comatose state, unable to voluntarily move his

body or hold his head up. Corrections and medical staff, which upon information and belief, included **Sgt. Orange**, did nothing to assist **Mr. Smith**. Instead, they shook him violently, attempted to lift his arm up which just flopped back to his side, and snatched his shoes off his feet before leaving him helpless and slouched against the wall.

104. As **Mr. Smith's** body further deteriorated, he again involuntarily defecated, urinated, and vomited on himself.

105. Hour after hour, throughout the mornings, afternoons, and evenings of August 23rd, 24th, 25th and 26th, Corrections and medical staff entered the TCC/Constant Watch confinement cell and found **Mr. Smith** lying helplessly on the floor, his head covered with a blanket, lethargic, unresponsive, stiff, filthy, naked, in pain, and suffering. Still, no one provided medical care or transported **Mr. Smith** to the hospital to relieve his suffering.

106. For four days, until EMS was finally summoned, and **Mr. Smith** transferred to the hospital, Corrections and medical staff walked by and entered the locked cell without helping and ignored his obvious and fatally deteriorating state until it was too late.

107. The number of times Corrections and medical staff observed **Mr. Smith's** while he was in dire circumstances during those four days—doing nothing to assist or aid him—shocks the conscience.

108. Instead of making obvious and necessary medical interventions, Corrections, and medical staff, including **R.N. Paden**, ordered a suicide blanket for **Mr. Smith** despite zero evidence **Mr. Smith** was suicidal, all in furtherance of their conspiracy to deny him critical medical care, and to conceal the brutal physical attacks and the severity of **Mr. Smith's** injuries.

109. Rather than providing the emergency assistance **Mr. Smith's** desperately needed, Corrections and medical staff, including the individual Defendants, who could have saved his life again failed to act, initially unwilling even to touch **Mr. Smith's** body, which was covered with feces, urine, and vomit.

110. Instead of making the obviously necessary interventions, correction and/or medical staff, including the individual Defendants, inexplicably watched **Mr. Smith** suffer, fanned their faces, covered their noses because of the stench, then walked away.

111. Upon information and belief, Defendant **R.N. Paden**, along with **Dr. Nwachukwu, Dr. Patel, R.N. Guida, R.N. Konamah, R.N. Naidoo, R.N. Fleurantin**, several Jane Roe staff nurses, physicians, or medical personnel, the **Assaulting Officers**, and **Supervising Defendants**, witnessed the severely injured **Mr. Smith** either in the infirmary and/or the TCC/Constant Watch confinement cell, yet offered no help or assistance and failed to provide him with medical care. Instead, these Defendants covered their noses in scorn, made derogatory remarks about the filthy condition **Mr. Smith** was in, turned, and walked out of the TCC/Constant Watch solitary confinement cell.

112. Upon information and belief, these Defendants, along with John Does 1-20, Correction Officers, supervisors, administrators, wardens, and other **NJDOC, NJDOH,** and **UCHC** personnel, also entered the TCC/Constant Watch solitary confinement cell, saw **Mr. Smith's** serious and rapidly deteriorating condition, and failed to provide him with medical care.

### ADTC & STU Infirmary

113. Following the initial physical assault on August 23, 2019, **STU** and **ADTC** Sergeants and Officers escorted **Mr. Smith** in handcuffs to the

infirmary where he was evaluated by **R.N. Konamah** at **ADTC** and cleared for TCC placement. **R.N. Konomah's** medical chart notes, electronically signed at 11:03 a.m., noted visible bruises from the handcuffs and an abrasion to **Mr. Smith's** right knee. The chart note indicates **Mr. Smith** was oriented to time, place, and person.

114. Despite being previously cleared for TCC, **Mr. Smith** was evaluated for TCC placement a second time on August 23, 2019 by **R.N. Naidoo** at the **STU.** Her medical chart notes, electronically signed at 10:35 p.m., noted **Mr. Smith** denied pain, had no complaints and was not in distress. This is untrue.

115. No evaluation of **Mr. Smith** was conducted on August 24, 2019. Nor was he provided with any medical care.

116. On August 25, 2019, **R.N. Paden** saw **Mr. Smith** at the **STU. Paden** claimed she was later called in to assess **Mr. Smith** because he was sitting against a wall, not responding to verbal stimuli. She noted when she lifted his arm, she met resistance. When corrections and medical staff attempted to remove his sneakers, **Mr. Smith** recoiled and held on to his foot. The chart notes, electronically signed at 12:28 p.m., states **Mr. Smith** <u>refused</u> to respond verbally.

117. **R.N. Paden** recorded **Mr. Smith's** interview attitude to be inappropriate mood and effect, inappropriate speech, inappropriate thought process, inappropriate bizarre behavior, and inappropriate hygiene. In an Appendix Note electronically signed at 3:05 p.m., on the 23rd, **Paden** states **Mr. Smith** was last seen with his head covered, and that a Corrections Officer stated he "turned over."

118. All signs pointed to a traumatic brain injury which is a serious medical condition. Nonetheless, instead of providing critical medical care

28

and transferring **Mr. Smith** to a hospital, **R.N. Paden** instructed Correction Officers to give him "a suicide blanket only."

119. **Mr. Smith** had no prior history of suicidal ideation or attempt.

120. **R.N. Paden** failed to properly evaluate **Mr. Smith** and failed to address **Mr. Smith's** deteriorating medical condition. When **Paden** saw **Mr. Smith,** he had involuntarily urinated, defecated, and vomited on himself. He exhibited signs of lethargy and appeared to be in a catatonic-comatose state. **Paden** also failed to document that **Mr. Smith** had been in altercations with the **Assaulting Officers** and failed to even consider or rule out the physical assaults as contributing to his deteriorating medical condition.

121. In a chart note signed electronically by **R.N. Naidoo** on August 26, 2019, at 8:26 p.m., she noted an officer was sitting outside **Mr. Smith's** cell, that he refused to answer questions, that he was in no distress, and that she would continue to monitor. This note was entered <u>after</u> **Mr. Smith** was found in a catatonic and comatose state on August 25, 2019.

122. A <u>late</u> entry chart note electronically signed by **R.N. Guida** on August 27, 2019, at 8:21 a.m., states she received an email from DOC Major to begin meal monitoring for **Mr. Smith** after it "was reported his last meal was at lunch time on Sunday, August 25, 2019." She states the Major notified her DOC assisted **Mr. Smith** "with showering, change of clothes and that he <u>agreed</u> to take Boost."

123. The chart note was entered after **Mr. Smith** was declared brain dead by the hospital on August 26, 2019.

124. Despite **Mr. Smith's** obviously catatonic-comatose state and his rapidly deteriorating condition, the **Medical Defendants** failed to properly evaluate and treat his injuries, failed to request emergency physician

assistance, failed to call 911 emergency, failed to provide any medical care to **Mr. Smith**, and failed to have him transferred to the hospital.

125. Despite showing obvious signs of a brain injury or neurological injury, **Mr. Smith** was not provided any care by a physician. Nor was he seen by a neurologist or orthopedic physician.

126. No physical examination was performed on **Mr. Smith** and his vital signs were not checked.

127. No treatment was rendered to **Mr. Smith** for his lethargic condition, his inability to respond to verbal commands, and his inability to move voluntarily.

128. **Mr. Smith** was not provided any pain medication.

129. **Mr. Smith** was not immediately taken to the hospital or any emergency care facility.

130. Instead of providing the critical care required, Corrections and medical staff, including the individually named Defendants, who knew **Mr. Smith** could not survive without urgent medical treatment, essentially stood by, and watched as he languished and deteriorated until it was too late to save him.

131. Finally, on August 26, 2019, as evening approached, EMS was summoned when it became clear that the brutal attacks and **Mr. Smith's** injuries and severe medical condition could no longer be swept under the rug or covered up.

132. When EMS workers arrived at 5:27 p.m., they found **Mr. Smith** unconscious, unresponsive, seizing, and unable to stand or walk without assistance. **Mr. Smith's** circulation motor sensory condition was documented as unconscious/syncope/dizziness.

133. Further evidence of **Mr. Smith's** severe and traumatic brain or head injury was documented by EMS. His total Glasgow Coma Scale was registered at 5. Eye movement was 1, verbal response was 1, and motor response was 2. A Glasgow Coma scale between 3-8 indicates a severe brain injury.

134. **Mr. Smith** was eventually transported to JFK where he arrived unresponsive. On arrival at JFK, **Mr. Smith** was placed on a ventilator due to his severe brain injury. By that time, nothing could be done to save his life.

135. A CT scan of the head revealed an ischemic stroke, documented as "findings consistent with a large recent left middle cerebral artery [MCA] territory infarct with severe edema and mass effect." A Neuro Critical Care consultant at JFK opined **Mr. Smith's** stroke likely started during the weekend after the altercation.

136. Medical literature highlights that trauma may precipitate an ischemic stroke. In the setting of the temporal relationship between the physical altercation and clinical diagnosis and given the inability to accurately assess the physical altercation, trauma cannot be completely excluded or included as an etiologic factor, either acting alone or in combination with natural causes, in the pathogenesis of **Mr. Smith's** stroke. A neuropathological examination disclosed certain abnormalities of **Mr. Smith's** brain.

137. **Mr. Smith** was ultimately pronounced dead on August 28, 2019, six days after the brutal attacks. He was 50 years old.

138. Despite **Mr. Smith's** objectively serious medical condition, the **Assaulting Officers**, **Supervising Defendants**, and **Medical Defendants**, were deliberately indifferent to **Mr. Smith's** immediate medical needs in that

31

they failed to make sure he received proper and timely medical treatment and/or transfer to an outside hospital.

139. As described above, Defendants subjected **Mr. Smith** to cruel, unusual, inhumane, and degrading treatment. The **Assaulting Officers** and Supervising Defendants, including, but not limited to **Powell, Mandara, Acebo, Persad, Shamberger, Sgt. Rodriquez, Valentin, Gilbert, Aponte, Foster, Perez, Sgt. Orange,** and **John Does 1-20,** even bragged about killing **Mr. Smith.**

140. As described above, Defendants consciously disregarded and were deliberately indifferent to **Mr. Smith's** safety and well-being and his objectively serious medical condition following the subject physical assaults.

141. Certainly, **Mr. Smith's** injuries were critical and of an objectively serious nature.

142. As a result of the **Assaulting Officers'** excessive use of force, **Mr. Smith** suffered catastrophic fatal injuries; however, the failures of Defendants to recognize his condition, including his severe head trauma, perform any diagnostic tests or examinations, request, authorize, and provide timely and adequate medical care and treatment to **Mr. Smith,** or to make arrangements and transport him to the hospital for critical medical care, caused him to maliciously and gratuitously suffer additional and prolonged conscious pain and suffering and resulted in his death.

143. **Mr. Smith's** medical condition was of such gravity that it can be objectively considered a serious medical condition. By ignoring all available signs that **Mr. Smith** had sustained a severe head trauma, that he was in severe pain and physical distress, and that his need for immediate

medical attention was serious, Defendants acted with deliberate indifference.

144. As set forth above, the subject assaults and denial of medical care, as well as the **Assaulting Officers**, **Supervising** and **Medical Defendants** on duty who ignored, acquiesced, joined and/or were complicit in same, constituted an unnecessary, unreasonable, and excessive use of force and deliberate indifference to **Mr. Smith's** serious medical needs.

145. Prior to the brutal physical assaults that killed him, **Mr. Smith** was a healthy 50-year-old man with no history of seizures or strokes.

146. The **Assaulting Officers** subjected **Mr. Smith** to unlawful, unjustified, and excessive force, and unnecessary and wanton infliction of pain.

147. At no point during the time periods mentioned herein did **Mr. Smith** neglect, refuse, or disobey any lawful command or order of a correction officer or violate a directive, rule, or regulation of the **NJDOC**.

148. At no point during the time periods mentioned herein did **Mr. Smith** offer violence to any officer or resident at **STU** or **ADTC**.

149. At no point during the time periods mentioned herein did **Mr. Smith** injure or attempt to injure **NJDOC** property.

150. At no point during the time periods mentioned herein did **Mr. Smith** attempt to escape, lead or take part in a revolt or insurrection.

151. At no time prior to using unlawful and excessive force upon **Mr. Smith** did any of the **Assaulting Officers** issue any verbal command or warning to **Mr. Smith** or use any other non-physical means of control on **Mr. Smith**.

152. Instead, the **Assaulting Officers** immediately began striking **Mr. Smith** in the head and all over his body without cause or justification and out of vengeance and malice.

153. The **Assaulting Officers** lacked any form of justifiable cause or reason to use excessive physical force and/or inflict blows upon **Mr. Smith** in order to control **Mr. Smith** or the subject location, enforce discipline, or maintain order as **Mr. Smith** was not involved in a fight, posed no threat to the **Assaulting Officers**, and did not disregard a lawful order.

154. The **Assaulting Officers'** actions were malicious, served no legitimate penological interest, and was grossly disproportionate to the circumstances then and there existing.

155. Several **NJDOC** Correction officers and medical staff assigned to the **STU** and **ADTC**, including the **Assaulting Officers**, **Supervising Defendants**, **Medical Defendants**, **John Does 1-20**, and **Jane Roes 1-20**, not only participated in and/or observed the brutal beatings, they failed to intervene to prevent the unlawful and unjustified use of excessive force upon **Mr. Smith**, and entered into a conspiracy and an agreement to conceal it by sanitizing the scene of the attacks and falsifying their reports about it.

156. None of the **Assaulting Officers**, **Supervising Defendants,Medical Defendants**, their immediate supervisors, or witness officers truthfully reported what they did, saw and heard. Instead, these Defendantsengaged in a cover up in which lies, and false accounts, were proffered toshift blame from the Assaulting Officers to **Mr. Smith** by falsely claiming**Mr. Smith** attacked **Mandara**, which is a blatant lie.

157. In an attempt to coverup the **Assaulting Officers'** brutal physical assault on **Mr. Smith**, the severity of his medical condition, and

the denial of medical treatment, the **Supervising Defendants**, including, but not limited to **Royce, Sgt. Rodriquez, Sgt. Orange, Lt. Riley, Lt. Costerio,** and **John Does 1-20,** conspired with and attempted to compel **Jane Doe nurse 1** to fabricate her report and **Mr. Smith's** medical records.

158. In further attempts to coverup the true nature of the attacks, upon information and belief, after realizing the camera showed **Powell** lied in her initial report and that **Mr. Smith** never approached or attacked her or **Mandara, Lt. Estrada** instructed **Powell** to rewrite her report to claim she was pulling **Mandara** away from **Mr. Smith.**

159. The **Assaulting Officers, Supervising Defendants,** and **Medical Defendants** not only participated in and/or observed the brutal beatings, none of these officers or medical personnel intervened to prevent the unlawful and unjustified use of excessive force upon **Mr. Smith,** and the denial of medical care for his serious medical needs, despite being present during the beatings and having ample opportunity to do so, and despite the physical assaults lasting for several minutes and even days.

### Witnesses to the Attack

160. Fearing Defendants were attempting to cover up the brutal physical assaults that killed **Mr. Smith,** multiple witnesses, including employees, medical personnel, and residents at the **STU** wrote to the New Jersey Attorney General and the United States Justice Department demanding an investigation. They provided detailed statements outlining their eyewitness accounts of the circumstances leading up to the violent physical assaults that caused **Mr. Smith's** death. Despite this, most of the witnesses have yet to be interviewed by the **NJDOC,** Special Investigative Unit, or State Investigators.

161. These witnesses, despite being afraid for their own safety, risked everything including their own safety and well-being, to contact **Mr. Smith's** family and several media outlets to relay what they witnessed, voice their concerns, report the retaliation they have experienced, and provide written statements. They live in constant fear of being harmed and retaliated against.

162. An autopsy was conducted by the Newark Medical Examiner's Office on August 31, 2019, and a neuropathology examination was conducted in September 2019. Despite this, the completion of the autopsy report was significantly delayed due to the **Assaulting Officers**, **Supervising Defendants**, **Medical Defendants**, and the State and **NJDOC** investigators' failure to provide the Medical examiner with the investigative file, including reports, videos, and other material related to the beatings that killed **Mr. Smith** despite multiple requests from the Medical Examiner's office.

163. **Mr. Smith's** family waited nearly one year before they were provided with some, but not all the details surrounding his death. To date, the autopsy report has not been publicly released.

164. As a result of the brutal beatings, **Mr. Smith** sustained a severe catastrophic brain injury, as well as other injuries that ultimately caused his death.

165. **NJDOC** Correction Officers, including some, or all the named Correction Officers have participated in multiple unlawful physical attacks on residents at the **STU** and **ADTC**, and on inmates at other **NJDOC** Correction facilities prior to the brutal physical assaults that killed **Mr. Smith**.

166. As set forth below, a number of those assaults, beatings, and misconduct by **NJDOC** Correction Officers is the subject of disciplinary

36

reports and lawsuits. This behavior and its frequency showed a custom, usage, or practice of unlawful conduct in the **NJDOC.**

167. Further, some or all those beatings occurred under the supervision of policymakers such as **Hicks** and **Royce,** and supervisors such as **Lt. Estrada, Lt. Costeiro, Sgt. Rodriguez, Sgt. Orange, Sgt. Riley,** and **John Doe Supervisors 1-20,** who either knew or should have known of their occurrences but failed to do anything about them.

168. The **Assaulting Officers** and their supervisors at the **STU** and **ADTC** exhibited the following general unlawful behavior: the ignoring of residents' complaints of threatened bodily harm from correctional officers, the unlawful beatings of residents, failure to intervene to prevent the unlawful use of excessive force on residents, including **Mr. Smith,** and concealing and attempting to conceal unlawful officer conduct via evidence clean-up and the falsification of reports.

169. Defendants named in this Amended Complaint each caused, or contributed to cause the severe, catastrophic, disabling, debilitating injuries, and death sustained by **Mr. Smith.** As such, the independent acts and/or omissions of all Defendants resulted in indivisible injuries to **Plaintiffs.**

170. Therefore, all Defendants are jointly and severally liable for the injuries, pre-death conscious pain and suffering, terror, fear of death, severe emotional trauma and mental anguish, the wrongful and untimely death of **Mr. Smith,** and other damages to **Plaintiffs** described in this Amended Complaint.

<u>**The Custom, Pattern, and Practice of Abuse**</u>

171. Within the New Jersey Department of Corrections facilities including at the **STU** and the **ADTC,** there is an invidious and discriminatory

37

custom, practice or policy of protecting employees and/or guards who have intentionally beaten, brutalized and/or otherwise violated the civil rights of residents and inmates. Rather than prosecuting, disciplining, or discharging such agents and employees, pursuant to this custom, either no action is taken, or the practice or policy is that these agents or employees are transferred to other facilities.

172. Pursuant to this custom, practice, or policy, the **NJDOC** through its officials including **Hicks**, **Royce**, and **John Does 1-20**, invidiously discriminate against residents, inmates, and their families by intentionally, deliberately, and wantonly suppressing any investigation into and/or prosecution of Correction Officers responsible for violating the civil rights of residents through harassment, assault, and battery.

173. As a result of this custom, practice or policy of protecting rather than disciplining or discharging Correction Officers who are known to violate the civil rights of residents and inmates, the **NJDOC**, **Hicks**, **Royce**, and **John Does 1-20**, recruited, retained, allowed and encouraged a number of such Correction Officers with known histories of intentionally harming, abusing, and violating the civil rights of residents to be transferred to and become part of the staff at other **NJDOC** facilities including the **STU** and the **ADTC**.

174. Prior to, and after August 23, 2019, it was known to the **NJDOC**, **Hicks**, and **Royce** that Correction Officers and medical personnel at the **STU** and **ADTC** were denying medical attention, using excessive force to inflict upon residents unnecessary and wanton injury, pain and suffering intentionally and deliberately, as well as retaliating against residentsfor exercising their rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution.

175. Despite such knowledge and existing duty, however, Defendants showed deliberate indifference to the situation knowing that by doing so they were creating a substantial risk of certain harm to residents such as **Darrell Smith.**

176. Notably, Correction Officers employed by the **NJDOC** have a well-documented history of aggressive police practices, including engaging in the unlawful use of excessive force against inmates, altering and fabricating official reports, conspiracy to conceal, and destroy critical evidence, falsifying medical records, intimidating eyewitnesses and witnesses by threatening bodily harm, coercing Correction and medical staff to alter, falsify, and conceal official reports, coverups, and conducting sham Internal Affairs investigations.

177. The brutal beating and use of excessive force on **Mr. Smith** and subsequent conspiracy to cover up the incident by the **Assaulting Officers**, their **Supervising Officers**, the **Medical Defendants**, and **NJDOC** officials including **Hicks** and **Royce**, was not an isolated or aberrational incident. It was the direct result of systemic deficiencies in the training, supervision, and discipline of **NJDOC** Correction Officers and employees of **UCHC**, including the individual named Defendants, that began long before the beating death of **Mr. Smith** and continue to this day.

178. Prior to the brutal physical assaults that killed **Mr. Smith**, the **Assaulting Officers** and other **NJDOC** Correction Officers participated in multiple unlawful physical attacks on residents and on inmates at the **ADTC**, the **STU**, and other **NJDOC** facilities. A number of those beatings were the subject of disciplinary reports and lawsuits. This behavior and its frequency showed a custom, usage, or practice of unlawful conduct in the

**NJDOC.**

179. Further, some or all those beatings and unlawful misconduct occurred under the supervision of policymakers such as **Hicks**, **Royce**, and supervisors such as **Estrada, Costeiro, Rodriguez, Orange, Riley**, and **John Does 1-20,** placing them on notice of the abuse of residents and inmates in their care but they failed to do anything about them.

180. The misconduct by the **Assaulting Officers** was undertaken pursuant to the custom, policy, and practice of the **NJDOC, STU**, and **ADTC** in that:

    a.    As a matter of custom, policy, and practice, the **NJDOC, STU,** and **ADTC** directly encourages and supports the type of misconduct and unlawful use of excessive force at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

    b.    As a matter of custom, policy, and practice, the **NJDOC, STU,** and **ADTC** facilitates the very type of misconduct and unlawful use of excessive force at issue here by failing to adequately punish and discipline prior instances of similar misconduct.

    c.    **NJDOC's** policy makers such as **Hicks** and **Royce** are aware of and condone the types of misconduct and unlawful use of excessive force at issue here, evidenced by their disciplinary inaction and failure to report and address misconduct by **NJDOC** Correction Officers, including the **Assaulting Officers**; and,

    d.    The **NJDOC, STU,** and **ADTC** failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the same, and thereby causing the types of injuries and death in this case.

    e.    The **NJDOC, STU,** and **ADTC** consciously disregarded an obvious risk that the systemic abuse by Correction Officers outlined above, if not remedied, would result in Correction Officers using unlawful and excessive force against residents and inmatesand were deliberately indifferent to the safety of **Mr. Smith** and others in their custody and under their care.

181. **Hicks, Royce,** and the **Supervising Defendants** at the **STU** and

ADTC exhibited the following general unlawful behavior: the ignoring of residents' complaints of threatened bodily harm from Correction Officers, including the **Assaulting Officers**, the unlawful beatings of residents, failure to intervene to prevent the unlawful use of excessive force on residents, concealing and attempting to conceal unlawful officer conduct via evidence clean-up and the falsification of reports, and coercing medical staff to change, alter, or conceal residents' medical records, including the medical records of Mr. Smith.

### Prior and Subsequent Instances of Misconduct within the NJDOC

182. The **NJDOC** and **Hicks** are currently the subject of significant media attention with regards to **Hick's** failure to protect inmates and residents in the custody of the **NJDOC** from other inmates and from physical and sexual abuse by Correction Officers.

183. Prior to and after the unprovoked beating death of **Mr. Smith**, there have been numerous allegations, lawsuits, and reports of unjustified use of excessive force, sexual and physical abuse of inmates, coverups, and deliberate indifference to serious medical needs perpetuated by **NJDOC** Correction Officers, employees of **NJDOH,** and medical professionals employed by the **UCHC**.

184. In a scathing April 2020 report, the United States Justice Department found the State of New Jersey, through the **NJDOC** and**Commissioner Hicks,** failed to protect and keep women safe from sexual abuseby staff at Edna Mahan. Specifically, the Justice Department found five Edna Mahan Correction Officers and one civilian employee were convicted orpled guilty to charges related to sexual abuse of more than 10 women undertheir watch from October 2016 to November 2019.[2]

[2] https://www.justice.gov/opa/pressrelease/file/1268391/download

185. For example, the Justice Department found that:

• In May 2018, an Edna Mahan correction officer was found guilty of five counts of sexually abusing prisoners. According to the sentencing judge, the "pervasive culture" at Edna Mahan allowed this correction officer to abuse his "position of authority to indulge in [his] own sexual stimulation."

• In July 2018, another Edna Mahan correction officer pled guilty to three counts of official misconduct after he admitted sexually abusing three separate prisoners.

• In January 2019, another correction officer pled guilty to official misconduct charges after admitting that he repeatedly sexually abused two of Edna Mahan's prisoners over a period of several years. In sentencing him, the New Jersey court concluded that the officer had "sexually assaulted a vulnerable population."

• Another Edna Mahan correction officer has been indicted for charges related to sexual abuse of prisoners and is pending trial.

• Corrections Officers coerce prisoners into sexual acts, grope them during strip searches and "routinely" demean them as "bitches," "dykes" and other slurs.

• Long-standing problems with staff sexual abuse at Edna Mahan have been documented for decades. Despite being on notice of this sexual abuse, **NJDOC** and Edna Mahan failed to take timely action to remedy the systemic problems that enabled Correction Officers and other staff to continue to sexually abuse Edna Mahan's prisoners.

• Women have suffered actual harm from sexual abuse and are at substantial risk of serious harm because the systems in place at Edna Mahan

discourage prisoners from reporting sexual abuse and allow sexual abuse to occur undetected and undeterred.

186.   The January 11, 2021, severe assault on six women at the Edna Mahan Correctional Facility is the subject of an ongoing criminal probe. One of the women reports she was sexually assaulted, one woman was punched 28 times, one suffered a broken eye socket and cheek bone, another was diagnosed with a concussion and had bruises all over her body, and a transgender woman was beaten so badly she is unable to walk and now uses a wheelchair. Officers also used pepper spray and other types of excessive use of force in violation of official policy. According to the New Jersey Attorney General, officers then "lied and attempted to cover up the assaults by "filing false reports about the incident, downplaying the seriousness of the incident and failing to document the true nature of the officer's actions that evening."

187.   A total of ten Correction Officers have been charged in connections with the January 11th, assault, including four supervisors and four senior correction officers who failed to intervene to prevent the attacks. Sgt. Amir E. Bethea was charged with two counts of second-degree official misconduct and two counts of third-degree tampering with public records. Sgt. Anthony J. Valvano was charged with second-degree official misconduct and third-degree tampering with public records. Sgt. Andraia Bridges was charged with 2nd degree Official Misconduct. Lt. Eddie Molina, the supervising officer, who was present for one of the extractions, was charged with two counts of 2nd Degree Official Misconduct, and 3rd degree Tampering with Public Records or Information for allegedly falsely reporting what had occurred in an email to other Department of Corrections officers and employees. Bridges and Molina are accused of being involved

in the forced cell extractions that left one woman with a fractured eye socket and another with a concussion. Sgt. Matthew D. Faschan was charged with two counts of second-degree official misconduct and one count of third-degree tampering with public records or information.

188. Senior Corrections Officer Jose Irizarry was charged with aggravated assault and official misconduct. Irizarry is accused of rushing into Emmalee Dent's cell, hitting her with his shield and then did nothing as another criminally charged officer punched her 28 times. Senior Correction Officers Gustavo Sarmiento Jr., Courey James, and Tara Wallace were charged with aggravated assault and official misconduct. They are accused of using excessive force and failing to stop or report the violence committed by their fellow officers. Officer Luis A. Garcia was charged with second-degree aggravated assault, second-degree official misconduct, and third-degree tampering with public records. A total of 32 staff at Edna Mahan were put on paid administrative leave after the incident.

189. The **NJDOC** and **Hicks** are currently the subject of significant media attention with regards to **Hick's** failure to protect inmates and residents in the custody of the **NJDOC** from other inmates and from physical and sexual abuse by Correction Officers.

190. The verified accounts of beatings and sexual assaults and altering official records to cover up the attacks brought a swift response from the Legislature. Multiple lawmakers have called on **Hicks** to resign arguing **Hicks** failed in his duties while human rights and civil rights have been routinely violated at the facility.

**Prior Lawsuits**

191. In a case eerily similar to this case, in June 2012, the State agreed to pay $1.5 million to settle a lawsuit filed by Lewis Williford,

a Camden County man who was beaten by Correction officers at Bayside State Prison in 2005, leading to a hemorrhagic stroke two weeks after medical staff at both Bayside and South Woods State Prison failed to treat him properly. The complaint alleges that on May 2, 2005, multiple prison guards entered Williford's cell and "slammed his head against the wall and beat him." The day after his attack, Williford was transferred to South Woods State Prison where the medical staff there similarly failed to properly diagnose or treat his injuries.

192. Williford claims the alleged beating, together with the alleged failure to diagnose and treat his injuries, caused him to suffer a hemorrhagic stroke on May 20, 2005, which left him incapacitated and "unable to ambulate himself, feed himself, dress himself or take care of his bodily functions." He was allegedly left with a "feeding tube to provide him with nourishment" and is unable to speak or "comprehend anything beyond basic instructions." Like this case, medical staff reportedly treated him, and despite his head trauma, "failed to recognize his condition or perform any diagnostic tests or examinations."

193. In May 2019, the State paid an undisclosed sum to settle a federal lawsuit filed by Robert G. Jillard, another inmate at Bayside State Prison. According to the Complaint, SCO John Caldwell directed several inmates to attack Jillard. Caldwell himself participated in the beating by holding down Jillard's head while the inmates repeatedly and brutally punched, kicked, stomped, and struck Jillard. Jillard suffered a collapsed lung, five broken ribs, and kidney and liver damage. He was taken by helicopter to AtlantiCare Regional Medical Center, where he was admitted into the intensive care unit. He underwent surgery for the insertion of a tube in his chest and remained hospitalized for four days.

194. Caldwell then threatened Jillard to remain quiet and initiated false disciplinary charges against him alleging Jillard failed to follow to "Follow Safety or Sanitation Regulations" by walking on a wet floor in violation of safety regulations. This was disputed by a civilian kitchen employee who stated the kitchen floor was dry prior to Jillard's alleged fall. Although Jillard notified SID on at least two occasions that he was "jumped" by Caldwell and a group of inmates and that Caldwell threatened him to keep quiet and to state he slipped and fell, as of September 16, 2014, the date of Jillard was released from prison, he had not seen or heard from the SID officers again.

195. On April 22 and 23, 2007, Rickie Allen Goldware, 39, a physically healthy thirty-nine (39) year-old man who suffered from mental illness, was killed by the Correction officers at East Jersey State Prison. Goldware allegedly died of cardiac complications brought on by an accelerated heart rate after he was strapped to a chair to be administered medications for his diagnosed mental illness. *An autopsy report revealed multiple bruises and contusions on his body, consistent with a beating.* A federal lawsuit filed by Goldware's mother, Hazel Richardson, Civil Action No: 2:09-cv-01383, contended Goldware was beaten after he was strapped to a chair and forcibly administered medications, and that this negligent disregard of his wellbeing caused his subsequent death. The lawsuit was *settled* in approximately 2010 for an unknown sum.

196. The State paid **$200,000** to settle a lawsuit against the **NJDOC**, Correction officer, lieutenants, sergeants, and senior Correction officers for the October 3, 2009, mock electrocution of Robert Grant, a mentally challenged resident at the **ADTC**. One week before Javier Tabora's release from the **ADTC**, a Sergeant instructed him to sit in an electronic chair

47

used to scan inmates for contraband and pretend to be electrocuted to terrorize Mr. Grant. When Mr. Grant was brought to the room by correction officers, he saw Tabora sitting in the chair shaking and screaming with cream soup seeping from his mouth for added effect. As Mr. Grant pleaded and begged not to be electrocuted, Sgt. Steven Russo, Officer Edward Aponte, and Sgt. Mark Percoco, handcuffed and strapped him to the chair, told him to remove his false teeth because they would fall out his mouth, attached wires to Mr. Grant's handcuffs, and threatened to turn up the power on the "electrocution device."

197. On November 6, 2015, Senior Correction Officers Steven Hotz, Brian Attardi, and Ivonne Collazo, physically abused Edwin Lopez, an inmate at the NJDOC's Garden State Youth Correctional Facility. Lopez claimed Hotz and Attardi held him down and punched him in the barbershop where he worked while Collazo shaved off his hair with clippers in retaliation for Lopez allegedly giving another officer a "bad" haircut. Hotz initially lied to investigators about the incident before finally admitting he had lied about his involvement. Hotz was fired for falsification in October 2016. Attardi and Collazo were also fired.

198. On July 13, 2010, Sgt. Kevin Newsom attacked inmate Bradley Peterson at the New Jersey State Prison by cracking him over the head several times with an expandable metal baton while Peterson was handcuffed, shackled, and offering no resistance. Peterson claimed in a federal lawsuit that several other officers punched, kicked, and used their batons to strike Peterson on various parts of his body, including his head. Newsom then directed his subordinate officer, SCO Israel, to write his Special Custody Reports in such a way that Newsom's misconduct would not be exposed. The Complaint alleged that several other officers not only participated in

48

and/or observed the beating, they failed to intervene and conspired with each other to conceal the beating by sanitizing the bloodied scene and falsifying their reports about it. Although administrative charges were filed against Newsom and he was removed from employment, none of the other Correction Officers suffered any consequences, which further emboldened them to use excessive force on inmates.

199.   Andrew Davis filed a federal lawsuit claiming he was physically assaulted and injured by Correction Officers at South Woods State Prison on July 26, 2016. Davis alleges Officer Victor Tapia came to his cell at night, ordered him to exit the cell, and physically assaulted him. Tapia sprayed him in the face with OC chemical spray while he and several other correction officers repeatedly struck, punched, and kicked him even after he was handcuffed on the ground.

200.   On April 13, 2018, Girolamo Bruscianelli, an inmate at the NJSP was brutalized, beaten, and threatened by a correction officer known as "Officer Hughes. Bruscianelli claimed in a Federal lawsuit, Civil Action No. 3:20-cv-02631, filed against the NJDOC, Hicks, Hughes, and others, that Hughes assaulted and struck him over 20 times between the hours of 7:00 AM and 8:00 AM while telling him he should be killed. Bruscianelli alleges that while his jail cell was open, Officer Hughes entered for no apparent reason, and viciously assaulted him. Several other Correction officers known to Bruscianelli as "Sgt. Rokeach" and "Officer Hamilton," were present during Officer Hughes' assault on Bruscianelli. All three watched the brutal assault and allowed it to continue, failing to step in to protect Bruscianelli until he had defecated on himself.

201.  A February 2015 Report from the Prison Watch Program of the American Friends Service Committee outlined over two decades of testimonies from prisoners across the United States including New Jersey.[3]

202.  "I was beaten in Northern State Prison then shipped to Trenton. The officers, 2 of 6, who attacked me had a hearing I learned that nothing was done. This happened November 2011. The shipped me out and threatened me with street charges. There were over 50 witnesses to my attack. I was brutalized! During this 6-month period I suffered numerous anxiety attacks due to the long-term torturous isolation. I've been in isolation for 6 months. I had to be placed on anxiety medication. While in solitary here at Trenton, an officer planted a federally controlled drug in my cell. He claimed on a "blue sheet" that the drugs were in a white envelope I challenged the "blue sheet" and had a cross examination at the hearing with a sergeant who was involved and the clearly mendacious employee. I wrote an extensive statement in my defense outlining and listing relevant case law. The 'committee' illegally agrees to hand down orders to have me drugged by force. A government psychiatrist who stated that she didn't agree with that order and expressed ethic concerns. She quickly removed / reversed the orders to drug me up. Shortly later the doctor moved on. She no longer works here, perhaps she's seen too much corruption." – *J. W., New Jersey State Prison, Trenton, NJ, 2014.*

203.  "I was assaulted four different times by correctional officers (excessive force) once in 2008, 2009, 2012, and 2013... I have endured sleep deprivation, screeching sounds, extreme silence, extreme cold and

---

[3] Testimonies of Torture in New Jersey Prisons - EVIDENCE OF HUMAN RIGHTS VIOLATIONS https://www.afsc.org/sites/default/files/documents/TORTURE%20IN%20NEW%20JERSEY%20PRISONS_0.pdf

heat, intentional situational placement, humiliation-a systematic attack on all human stimuli. . . Prisoners are constantly being bitten and could possibly become infected with diseases such as MRSA." – *P. B., New Jersey State Prison, Trenton, NJ, 2014.*

204. The following is a testimony written by a Public Defender. ". . . Mr. K also states that when he was being processed for his transfer from Bayside State Prison back to South Woods State Prison, he was "kick and stomp on" on the same knee where he had his operation. He states that as a result of this incident, he is now wheel-chair bound and unable to walk. Mr. K requests an operation on his knees which he believes is necessary to enable him to walk again. He states that he has submitted 7 Medical slips without a response." – *M.K., New Jersey State Prison, Trenton, NJ, 2014.*

205. "This sergeant put his hands on me and told me why did I make false accusations on him while he was beating me in the back and chocking me." – *K. P., Northern State Prison, Newark, NJ 2014.*

## COUNT I
## (8th & 14th Amendment Excessive Force – (42 U.S.C. § 1983)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

206. All prisoners, including those serving a sentence of incarceration, those held in jail pending trial, and those, like **Mr. Smith**, who are involuntarily committed, have a right under the Eighth and Fourteenth Amendment of the United States Constitution to be free from excessive force constituting cruel and unusual punishment by prison and jail staff.

51

207.  On two separate occasions between August 23, 2019 and August 26, 2019, the Assaulting Officers,[4] repeatedly attacked Mr. Smith in a gang-style assault while he was in handcuffs, subdued, and offering no resistance. They slammed him to the ground, beat, kicked, punched, stomped, placed him in an illegal chokehold, and slammed his head into a glass door.

208.  The **Assaulting Officers**, acting under color of law, used unlawful and unreasonable excessive physical force on **Mr. Smith** without provocation, legal cause, or justification, and with purposeful and malicious intent to cause harm to **Mr. Smith** and did in fact cause his tragic and untimely death.

209.  The **Assaulting Officers'** negligent, reckless, and intentional acts of physically assaulting **Mr. Smith**, and their use of unreasonable and excessive force against him without justification or provocation, constitute cruel and unusual punishment and showed deliberate indifference for the life and safety of **Mr. Smith**.

210.  The conduct of the **Assaulting Officers** constituted excessive force in violation of the United States and New Jersey Constitutions.

211.  The actions of the **Assaulting Officers** were objectively unreasonable and were undertaken intentionally, with malice and depravity, and with willfulness and reckless indifference to **Mr. Smith's** constitutional rights.

212.  By their conduct, the **Assaulting Officers** deprived **Mr. Smith** of his right to be free from malicious, sadistic, excessive, unreasonable, and deadly force under the Eighth and Fourteenth Amendment of the United

---

[4] Powell, Mandara, Acebo, Persad, Shamberger, Sgt. Rodriquez, Valentin, Gilbert, Aponte, Foster, Perez & John Does 1-20.

States Constitution, the New Jersey Constitution, and under the New Jersey Civil Rights Act.

213.  As set forth above, the aforesaid unlawful use of excessive force and misconduct by the **Assaulting Officers** was part of a widespread practice at the **NJDOC**, **STU**, and **ADTC** that, although not expressly authorized, constituted a custom or usage of which the **NJDOC**, **STU**, **ADTC**, **Hicks**, and the Supervising Defendants, including **Royce** were aware and did nothing to remedy it.

214.  The **NJDOC**, as the employer of Defendants, are responsible for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

215.  As a direct, proximate, and natural result of the wrongful acts and omissions by the **Assaulting Officers** and other presently unknown agents and/or employees of the **NJDOC** as described hereinabove, Plaintiffs suffered and continue to suffer special and general damages in amounts that together with prejudgment interest will be proven at trial. The nature of the special damages inflicted upon **Mr. Smith** by the **Assaulting Officers** are such that they continue and increase daily. Nevertheless, among the special damages for which Plaintiffs now make claim are for the funeral and burial expenses of **Mr. Smith**, together with prejudgment interest as allowed by law.

216.  The acts and/or omissions of Defendants demonstrate a deliberate indifference to, and conscious disregard for, the safety of others, including **Mr. Smith**. Therefore, an award of punitive/aggravating damages against the individually named Defendants including the **Assaulting Officers**, **Supervising Defendants**, including **Royce**, and **Hicks** is appropriate in this case.

217. As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, **Mr. Smith** sustained severe, catastrophic, and deadly injuries, experienced excruciating conscious pain and suffering over a six-day period, and ultimately died.

218. As a direct and proximate result of the **Assaulting Officers'** unlawful, unjustified, and unreasonable use of excessive force, their misconduct and abuse of authority detailed above, as well as the **NJDOC**, **STU**, and **ADTC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers, **Mr. Smith** sustained severe, catastrophic, disabling, debilitating, and deadly injuries which caused his wrongful, tragic, and untimely death on August 28, 2019, and suffered damages, including, but not limited to a great deal of excruciating and debilitating pre-death conscious pain and suffering, terror, disability, loss of motor function, fear of impending death, severe emotional trauma and mental anguish over a six-day period, was prevented from attending to his normal pursuits, and other damages to him and Plaintiffs described in this Complaint.

## COUNT II
### (Common Law Assault and Battery)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

219. By physically attacking and severely injuring **Mr. Smith**, the **Assaulting Officers**, acting in their individual and official capacity as employees of the **NJDOC**, and within the scope of their employment, committed an unlawful, unwarranted, negligent, careless, and reckless assault and battery upon **Mr. Smith** that resulted in his tragic and untimely death.

220. The **Assaulting Officers**, acting under color of law, did batter and use excessive physical force on **Mr. Smith** without provocation, legal cause, or justification, and with purposeful and malicious intent to cause harm to **Mr. Smith** and did in fact cause his tragic and untimely death.

221. By assaulting and intimidating **Mr. Smith**, the **Assaulting Officers** intended to put him in an unreasonable and immediate apprehension of such contact and did in fact put **Mr. Smith** in an unreasonable and immediate apprehension of a harmful or offensive contact with his body.

222. The actions of the **Assaulting Officers** constituted an offensive physical contact made without the consent of **Mr. Smith**, and were undertaken recklessly, negligently, willfully, and wantonly, and intentionally.

223. The fatal attack upon **Mr. Smith** by the **Assaulting Officers** was expressly or implicitly authorized by Defendants, fairly and naturally incident to operations at the **NJDOC, STU**, and **ADTC**.

224. The **NJDOC**, as the employer of the **Assaulting Officers**, are responsible for their wrongdoing under the doctrine of <u>respondent</u> <u>superior</u> and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

225. As a direct and proximate result of the **Assaulting Officers'** unlawful and unwarranted assault and battery, their misconduct and abuse of authority detailed above, as well as the **NJDOC, STU**, and **ADTC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers, Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT III
### (Unlawful Seizure – 42 U.S.C. § 1983 & Common Law

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

226. After brutally assaulting **Mr. Smith**, the **Assaulting Officers**, **Supervising Defendants**, and **John/Jane Does 1-20**, acting in their individual and official capacity as employees of the **NJDOC** and, within the scope of their employment, unlawfully seized, use excessive force, and confined **Mr. Smith**, who was innocent of any wrongdoing, in the TCC/Constant Watch/Solitary Confinement, D Unit, for four (4) days without due process.

227. Instead of providing **Mr. Smith** with prompt medical care for the severe injuries he sustained in the brutal assaults, **Estrada** ordered **Rodriquez** to unlawfully seize, imprison, and confine **Mr. Smith** to TCC/Constant Watch, even though **Mr. Smith** posed no threat to Defendants, himself, or others.

228. By their unlawful conduct, Defendants, under color of state law, deprived **Mr. Smith** of his right to life and liberty without due process and his right to be free from unreasonable seizure under the Eighthand Fourteenth Amendment to the United States Constitution, New Jersey State law, including <u>N.J.A.C.</u> 10A:5-7.1, and common law.

229. Defendants each had a duty to prevent the unlawful seizure, unlawful confinement, and depravation of liberty imposed on **Mr. Smith** but failed to do so. Instead, Defendants conspired with each other to lie, fabricate evidence, and falsify the official reports relating to the brutal assaults on **Mr. Smith** to justify his illegal confinement and deprivation of his right to life and liberty without due process.

230. Defendants are each liable for their failure to take any reasonable steps to protect **Mr. Smith** from the unlawful seizure, illegal solitary confinement, and deprivation of his right to life and liberty, despite having ample evidence, time, and opportunity to do so.

231. In all the foregoing, Defendants acted with negligent, careless, reckless, callous, and with deliberate indifference to **Mr. Smith's** constitutionally protected rights.

232. The **NJDOC**, as the employer of Defendants, are responsible for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

233. As a direct and proximate result of the **Assaulting Officers'** unlawful and unwarranted assault and battery, their misconduct and abuse of authority detailed above, as well as the **NJDOC, STU,** and **ADTC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers, Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

### COUNT IV
### Negligence/Medical Malpractice – All Defendants

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

234. At the time he was viciously beaten to death, **Darrell Smith** was under the sole and exclusive custody, control, and supervision of the **NJDOC, STU,** and/or the **ADTC,** who were responsible for the care, health, safety, and welfare of all residents and inmates within their control, including **Mr. Smith.**

235. Defendants, therefore, owed **Mr. Smith** a duty to exercise extraordinary care in providing for his care, safety, health, and welfare. This duty of care included, among others, the duty to protect him from assaults and attacks upon his person and to promptly provide him with medical attention for his injuries.

236. The death of **Mr. Smith** was also not of a type that ordinarily occurs in the absence of a breach of duty and, as such, **Mr. Smith's** death could not have occurred but for a breach of this duty of care owed to him by Defendants. Defendants are thus strictly liable for **Mr. Smith's** death and the resulting injury to Plaintiffs.

237. In carrying out its non-delegable constitutional duty under the Eighth Amendment to provide adequate medical treatment to those in its custody, the State, through its **NJDOC** and **NJDOH** contracted with **UCHC**, to provide such medical care and health services to residents at the **STU** and **ADTC**, and to prisoners in State prisons.

238. In carrying out its duties, **UCHC** was required to ensure that the personnel it employed at the **STU** and **ADTC** complied with all **NJDOC** and **NJDOH's** policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes, and regulations. UCHC was also responsible for the appointment, training, supervision, and conduct of all medical personnel, including the individual **Medical Defendants** named herein. It failed to do so.

239. At all times relevant, the **Medical Defendants**, were members of **UCHC's** medical staff assigned to the **STU** and **ADTC** infirmaries on August 23rd through August 26th, 2019. These Defendants had a duty to provide competent and thorough professional services in all aspects of **Mr. Smith's** health care on August 23-26, 2019.

240.  The standard of care is for medical practitioners to provide reasonably prompt medical care, provide timely emergency treatment, properly keep adequate and accessible medical records, review a patient's medical record, communicate with other medical practitioners, identify and correct incompetent medical treatment, and perform an adequate evaluation of the patient.

241.  The standard of care is to treat patients with severe head injuries/brain trauma as soon as possible and to immediately transport the patient to a hospital with computed tomography (CT) scanning capability and neurosurgical care with ICP monitoring available to prevent catastrophic and permanent damage or death to the patient.

242.  At all times relevant, **Mr. Smith** was a patient of **UCHC** and the **Medical Defendants.**

243.  Following the subject unlawful use of excessive force, **Mr. Smith** was evaluated by the **UCHC's** physicians and or nurses, including but not limited the individual **Medical Defendants** identified in this Complaint. At the conclusion of the purported examinations, the physicians and registered nurse Defendants failed to properly treat and/or diagnose **Mr. Smith's** condition.

244.  The **Medical Defendants** were on notice that **Mr. Smith** sustained severe and potentially deadly injuries in the brutal attacks, as he was under their care at the Special Treatment Unit.

245.  Although **Mr. Smith** presented with the common symptoms of a severe head injury and/or traumatic brain injuries following the attacks, the **Medical Defendants** failed to identify, diagnose, or treat his severe brain injuries.

59

246. Despite observing the severity of **Mr. Smith's** symptoms, Defendants negligently classified **Mr. Smith's** condition as fraudulent and self-conceived and failed to treat or timely transfer **Mr. Smith** to a hospital for further evaluation and treatment that could have saved his life.

247. Defendants witnessed **Mr. Smith's** critical and rapidly deteriorating medical condition over a four-day period. However, Defendants failed to provide him with appropriate medical care or transfer him to the hospital for proper medical care. Instead, Defendants ordered a suicide blanket for **Mr. Smith** who had no history of being suicidal. Defendants ignored **Mr. Smith's** obvious catatonic and fatally deteriorating state until it was too late.

248. Despite their clear duties, the **Medical Defendants** failed to provide reasonably prompt medical care; failed to provide timely emergency treatment; failed to properly keep adequate and accessible medical records; falsified and/or changed their medical records to aid in the coverup of the assaults and injuries to **Mr. Smith**; failed to recognize the emergent situation; failed to communicate with other medical practitioners; failed to identify and correct incompetent medical treatment; ignored the symptoms of a traumatic brain injury; failed to properly evaluate **Mr. Smith**, failed to request immediate medical physician action; failed to timely transfer **Mr. Smith** to an emergency care facility, such as a hospital, and failed to provide proper care to **Mr. Smith**.

249. Defendants denied **Mr. Smith's** serious need for medical treatment. They knew he needed critical medical care to save his life and intentionally refused to provide it, delayed necessary medical treatment

for non-medical reasons, and prevented **Mr. Smith** from receiving emergency treatment for a severe brain injury, a serious medical need.

250. The **Medical Defendants** failed to use the care and skill ordinarily used by physicians and nurses engaged in the practice of medicine in New Jersey, or in similar localities.

251. If the **Medical Defendants** had used proper methods of examination and/or used the care and skill ordinarily used by individuals engaged in the practice of medicine, Defendants would have discovered that **Mr. Smith** was suffering from a severe head or brain injury which required immediate medical treatment to effect a cure and prevent risk of death and/or serious injury.

252. If the **Medical Defendants** had used the care and skill ordinarily used by physicians and nurses engaged in the practice of medicine, Defendants would have provided medical treatment by immediately transferring **Mr. Smith** to a hospital to prevent his death.

253. At all relevant times, Defendants acted in their individual and official capacity and under the color of state law, with deliberate indifference to **Mr. Smith's** serious medical needs by failing to identify or provide proper treatment to **Mr. Smith** for his catastrophic and life-threatening injuries.

254. Each Defendant knew, or should have known, that denying, interfering with, and delaying emergent medical care for **Mr. Smith's** traumatic head or brain injury was an excessive risk to **Mr. Smith's** health. They consciously disregarded this risk by repeatedly failing to properly provide medical care to **Mr. Smith** for his injuries.

255. The failure to properly diagnose **Mr. Smith's** condition, the failure to provide critical medical treatment; the delay in transporting

**Mr. Smith** to a hospital; Defendants' deliberate indifference to **Mr. Smith's** serious medical need; Defendants' knowingly inadequate care of **Mr. Smith**; Defendants' policies producing an environment for providing inadequate care for non-medical reasons resulted in **Mr. Smith's** untimely and tragic death.

256. These actions demonstrate negligence, gross negligence, and reckless indifference to the health and rights of **Mr. Smith**. Defendants' conduct was negligent, willful, wanton, reckless, malicious, careless, and negligent and in violation of the federal and state Constitutions, local laws, statutes, ordinances, rules, regulations, and codes.

### Policies, Practices, and Culpable Conduct

257. Defendants **NJDOC**, **NJDOH**, **UCHC**, **Hicks**, **Royce**, **Brewer**, **Ghinassi**, and **White** established the medical policies, practices, and customs at the **STU** and **ADTC**.

258. A traumatic brain injury is not lethal if detected and treated in a timely manner.

259. A traumatic brain injury and the related symptoms is a serious medical need.

260. A pulse oxygen level of 85 is a cause for serious concern and requires immediate medical attention.

261. Lethargy, shortness of breath (dyspnea), musculoskeletal and neurological stiffness, decreased feeing in the extremities, muscle weakness and paralysis of the arms or legs, inability to respond to verbal and tactil stimuli, pulse oxygen level of 83%, and involuntary incontinence of urine and feces, are commonly known symptoms of a traumatic brain injury.

262. Swelling of the brain, decreased feeing in the extremities, muscle weakness, paralysis of the arms or legs, tremors, and seizures are commonly known symptoms of severe brain injury.

263. A brain herniation means there is so much pressure, the brain collapses down toward the spine. This is about the most painful event someone can go through until the herniation completes.

264. In August 2019, each Defendants knew that a traumatic brain injury was a serious medical need.

265. Defendants were deliberately indifferent to the serious medical needs of **Mr. Smith** by failing to train and supervise staff to implement adequate jail policies, procedures, customs, usages, and protocols that would properly address the obvious and known health and safety risks experienced by residents with symptoms of severe brain injuries or head trauma.

266. Defendants' failure to treat **Mr. Smith's** injuries was negligent, knowing, intentional, reckless, wanton, and deliberately indifferent to the serious medical needs of **Mr. Smith**.

267. Defendants failed to have adequate policies, procedures, customs, usages, and protocols, regarding identification, referral and treatment due inmates experiencing symptoms of severe head or brain trauma and those inadequate policies, procedures, customs, usages, and protocols were the moving force behind the injury and death suffered by **Mr. Smith**.

268. **Mr. Smith** was not properly monitored, diagnosed, or treated. This failure was caused by the policies, practices customs, usages, and protocols of the **NJDOC, NJDOH, STU, ADTC,** and **UCHC**.

269. The above-mentioned injuries and conditions were caused and brought about by the negligence of the **Medical Defendants,** which negligence

is imputable to Defendants **UCHC**, **NJDOC** and **NJDOH**, for the negligent hiring, retention, and/or failing to properly train and supervise these Defendants.

270.   Defendants **UCHC**, **NJDOC**, and **NJDOH** hired and had control over, maintained and/or supervised the individually named Defendants.  Thus, Defendants are liable for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, N.J.S.A. § 59-2-2, et seq.

271.   As a result of such negligence by Defendants, **Mr. Smith** suffered conscious pain and suffering and ultimately loss of life.

272.   The conduct of Defendants shocks the conscience, violates the standards of decency in an evolving society, and betrays the trust that residents, inmates, and the public, place in correctional and medical staff to provide proper medical care for those over whom they exercise custody.

273.   As a direct and proximate result of the **Medical Defendants'** negligence detailed above, as well as **UCHC**, **NJDOC**, and **NJDOH's** custom, policies and practices of failing to train, control, and/or supervise its employees, Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT V
### (Negligence – All Defendants)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

274.   Defendants owed numerous duties to **Mr. Smith** and Plaintiffs.

275.   The heightened duty of care owed to **Mr. Smith** was breached when the Assaulting Officers, Supervising Defendants, and Medical Defendants, acting in their individual and official capacities as employees and/or agents of the **NJDOC**, **NJDOH**, and the **UCHC**, negligently used unlawful and excessive force on him, failed to intervene to prevent the unlawful use of

excessive force, illegally confined him to TCC/Constant Watch, failed to provide him with appropriate medical care, conspired to deny him medical care for his serious medical condition, conspired and agreed to cover up the true nature of the attacks and Mr. Smith's injuries, and caused his death.

276. By their acts and omissions, Defendants violated the duty of care owed to **Mr. Smith**. Defendants acted with gross negligence and/or recklessly and their acts and omissions did not involve the mere exercise of professional judgment of discretion.

277. The traumatic, catastrophic, and painful injuries that caused Mr. Smith's death could not have occurred but for a breach of this duty of care owed to him by Defendants. Defendants are thus strictly liable for **Mr. Smith's** death and the resulting injury to Plaintiffs.

278. Defendants **NJDOC, NJDOH, STU, ADTC,** and **UCHC,** hired and had control over and/or supervised the **Assaulting Officers, Supervising Defendants**, and **Medical Defendants**. Thus, Defendants are liable for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, N.J.S.A. § 59-2-2, et seq.

279. As a direct and proximate result of Defendants' negligence detailed above, as well as **UCHC, NJDOC, NJDOH, STU,** and **ADTC's** custom, policies and practices of failing to train, control, and/or supervise its employees, Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

<u>**COUNT VI**</u>
<u>**(Conspiracy - 42 U.S.C. § 1983 & 1985(3) & Common Law**</u>
<u>**All Defendants)**</u>

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

280. Each Defendant, acting under the color of law, willfully conspired with each other, reached a mutual understanding, and acted to undertake a course of conduct to injure, oppress, psychologically torment, threaten, falsely imprison, and intimidate **Mr. Smith** in the free exercise and enjoyment of the rights and privileges and equal protection of the law secured to him by the United States Constitution

281. Following the severe beatings that killed **Mr. Smith**, the **Assaulting Officers, Supervising Defendants, Medical Defendants, John/Jane Does** 1-20, and **Jane Roes 1-20,** acting individually and/or in concert and conspiracy with one another, agreed to commit the horrific acts visited upon **Mr. Smith**, gained knowledge of the plan and observed its occurrence, conspired to deprive **Mr. Smith** of medical treatment for his obvious and serious medical needs, and conspired to protect the actual officers committing the physical and psychological offenses and keep confidential the plan, conspiracy and conduct of all involved officers.

282. In a massive conspiracy to cover up the true nature of the brutal attacks and the severity of the injuries that resulted in Mr. Smith's tragic and untimely death, the **Assaulting Officers, Supervising Defendants**, and **Medical Defendants,** took specific and intentional action to cover-up their unlawful conduct, made up a false cover story to hide what they did, repeatedly lied in Correction Department records, lied to State investigators; coerced or attempted to coerce witnesses, other N**JDOC,**

**STU**, **ADTC**, and **UCHC** staff and medical personnel to fabricate, alter, delete, change, and destroy the incident reports, medical records, evidence of the assaults, the severity of **Mr. Smith's** injuries, and, upon information and belief, even created a phony injury to one of the **Assaulting Officers.**

283. Defendants took numerous overt, specific, and intentional action to cover-up their unlawful conduct, including but not limited to conspiring to create a false narrative of what transpired; conspired, agreed, drafted, executed, and filed knowingly false statements, reports, and medical records that falsely claimed **Mr. Smith** was not injured and that **Mr. Smith** was suicidal; conspired and reached an agreement to deny and interfere with others attempt to provide **Mr. Smith** access to timely and appropriate medical care and treatment in an effort to conceal his serious and life threatening injuries; prevented others from truthfully documenting and/or photographing **Mr. Smith's** injuries; and coerced and/or attempted to coerce residents, Corrections, and medical staff to falsify incident reports and **Mr. Smith's** medical records.

284. Defendants also failed to report the incident to local, state and/or federal authorities; destroyed, altered, and concealed physical evidence; gave false statements and testimony to **NJDOC** brass, State investigators, and prosecutors; made repeated and knowingly false statements about the incident and **Mr. Smith's** deteriorating medical condition in official reports, and in disciplinary and/or criminal proceedings commenced against them; and were deliberately indifferent to his obvious and objectively serious and critical medical condition.

285. Acting in concert and conspiracy with one another and in furtherance of said conspiracy and cover-up, each Defendant, acting in

their own self-interest to avoid criminal prosecution, civil liability and/or employment-related disciplinary proceedings, drafted, executed and filed knowingly false statements and reports wherein Defendants and their supervisors dishonestly stated **Mr. Smith** posed a danger to officers and/or to others in the facility; that **Mr. Smith** failed to obey a lawful order; that **Mr. Smith** caused and/or threatened to cause serious physical injury to himself, an officer, or departmental property. Defendants also conspired with each other and came to an agreement to issue a Notice of Disciplinary Infraction to **Mr. Smith**, which falsely claimed **Mr. Smith** attacked **Mandara** and that reasonable force was utilized to gain control of **Mr. Smith**. None of this was true.

286. In furtherance of their conspiracy, Defendants confiscated **Mr. Smith's** soiled clothing and immediately discarded and/or laundered same to remove any evidence of blood, DNA, and other physical evidence; provided false statements to EMT workers, physicians at JFK, claiming **Mr. Smith's** injuries and deteriorating medical condition were the result of seizures despite the fact he did not have a seizure disorder or prior history of seizures; conspired and agreed to withhold the true account of the nature of **Mr. Smith's** injuries which was necessary for his physicians to make an appropriate diagnosis and provide the appropriate medical care; conspired and agreed to block physicians at JFK from discussing **Mr. Smith's** injuries and conditions with his family; attempted to block **Mr. Smith's** family from seeing him in the hospital; .

287. As part of said conspiracy and cover up the Assaulting Officers and Supervising Defendants have threatened and retaliated against witnesses at the **STU** and **ADTC** who reported the brutal beating death of **Mr. Smith**.

288.   Despite multiple requests from the Medical examiner's office, the **NJDOC**, **STU**, **ADTC**, **UCHC**, and the individually named Defendants, failed to turn over the investigative reports, medical records, videos, and other documents and materials related to the physical assaults on **Mr. Smith**, resulting in an eleven-months delay in the completion of the autopsy report and **Mr. Smith's** family not being told what happened or how he died for eleven months.

289.   Defendants each had knowledge that a 42 U.S.C. §1983 (civil rights) conspiracy was in progress, had the power to prevent or aid in preventing the conspiracy from continuing, and neglected or refused to do so. With due diligence, Defendants could have promptly reported the subject events to superiors and to duly authorized investigators. Their failure to do so allowed the conspiracy to continue, evidence to be destroyed, and truth to be suppressed.

290.   Had Defendants complied with the law and furnished truthful information to medical providers and/or authorities about their conduct and/or the violent and malicious beatings **Mr. Smith** endured at the hands of the **Assaulting Officers**, the conspiracy would not have succeeded to the extent that it did, and **Mr. Smith** would not have been denied critical medical care that could have saved his life.

291.   As a result of said conspiracy, Defendants deprived **Mr. Smith** of the rights and privileges afforded by the United States and New Jersey Constitutions, including but not limited to his right to be free from: unreasonable and excessive force; cruel and unusual punishment; the delay and denial of medical attention; unnecessary and wanton infliction of pain; reprisal for exercising his First Amendment right to associate and speak freely; denial of equal protection of the law; and his right to due process.

69

292. The **NJDOC** and **UCHC**, as employer of these Defendants, are responsible for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

293. As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, as well as the **NJDOC** and **UCHC's** custom, policies and practices of failing to train and discipline their Correction Officers and medical staff, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

<u>**COUNT VII**</u>
<u>**Failure to Intervene - 42 U.S.C. § 1983,**</u>
<u>**N.J.S.A. 10:6-2 & Common Law**</u>

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

294. At all times alleged herein, the **Assaulting Officers**, **Supervising Defendants**, **Medical Defendants**, **John Does 1-20**, and **Jane Roes 1-20**, were Correction Officers and medical personnel at the STU and/or ADTC, who either participated in, were present during, and/or had actual knowledge of the unlawful use of excessive force, unlawful TCC/Constant Watch solitary confinement of **Mr. Smith**, and the denial of medical care for **Mr. Smith's** obvious and serious medical needs.

295. Defendants had a duty to intervene, to summon help, or take other precautionary measures to prevent and/or stop the brutal, unjustified, and unlawful use of excessive and deadly force against **Mr. Smith**, and the denial of medical care for his serious medical needs. All watched the brutal assaults and allowed them to continue, failing to step in to protect **Mr. Smith** despite the physical assaults lasting for several

minutes each day. None of these Defendants intervened to prevent the unlawful use of excessive force and the egregious denial of medical care that lasted four days despite having sufficient time to do.

296. Defendants knew **Mr. Smith** faced a serious risk of substantial harm and had a reasonable opportunity to intervene to prevent the brutal and deadly assaults but chose not to do so. Thus, they are liable for the harm he suffered.

297. Instead of intervening, Defendants conspired and agreed to conceal the assaults and the severity of **Mr. Smith's** injuries by sanitizing the scene of the assaults, falsifying their reports about it, destroying or concealing evidence, and falsifying, altering, or changing Mr. Smith's medical records.

298. The **NJDOC** and **UCHC**, as employer of Defendants, are responsible for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

299. As a direct and proximate result of Defendants' failure to intervene and their misconduct and abuse of authority detailed above, as well as the **NJDOC, STU, ADTC** and **UCHC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers and medical staff, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

<u>**COUNT VIII**</u>
<u>**(42 U.S.C. § 1983 – 8th Amendment Cruel and Unusual Punishment**</u>
<u>**& N.J.S.A. 10:6-2 (Excessive Force)**</u>

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

300.  The Eighth Amendment to the Constitution of the United States prohibits cruel and unusual punishment.

301.  The **Assaulting Officers**, **Supervising Defendants**, Medical Defendants, J**ohn Does 1-20**, and Jane Roes 1-20, acting under color of law, subjected **Mr. Smith** to the malicious, sadistic, and unlawful use of excessive force and the egregious denial of medical care for his objective serious medical needs.

302.  **Mr. Smith** sustained massive injuries, deliberately inflicted upon him by the **Assaulting Officers**. The trauma inflicted upon **Mr. Smith** was intended to and did result in his extreme pain and suffering and ultimate death. Furthermore, from the time **Mr. Smith** was assaulted and locked in the TCC/Constant Watch cell until his eventual death, he suffered great physical conscious pain and suffering, mental and emotional distress, shock, and agony.

303.  By subjecting **Mr. Smith** to the unlawful use of excessive force, illegally confining him to a TCC/Constant Watch solitary confinement cell, denying him access or interfering with his access to adequate medical treatment that could have saved his life, failing to intervene to prevent the unlawfully use of excessive force, and by exhibiting deliberate indifference to **Mr. Smith's** rights by not acting on information which indicated that unconstitutional acts were occurring, Defendants deprived **Mr. Smith** of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution to be free from cruel and unusual punishment.

304. Defendants' willful, wanton, malicious, and reckless acts of physically assaulting, securing, confining and/or restraining **Mr. Smith**, and denying medical care for his serious medical needs, constituted cruel and unusual punishment and reveal a conscious indifference to the clear risk of death or serious injury to **Mr. Smith** that shocks the conscience.

305. As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, as well as the **NJDOC**, **STU**, **ADTC** and **UCHC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers and medical staff, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

### COUNT IX

### [42 U.S.C. § 1983; N.J.S.A. 10:6-2(1); Article 1, Paragraph 12 Deliberate Indifference to Serious Medical Needs All Defendants]

306. Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

307. The United States Supreme Court has repeatedly held that prison officials have a constitutional obligation to provide adequate medical care. An inmate must rely on prison authorities to treat his medical needs; if they fail to do so; those needs will not be met. The failure to treat, and unreasonable delays in treating, residents and inmates with serious medical conditions results in a worsening of their medical problems, and otherwise inflicts unnecessary pain and suffering. In the worst cases, such a failure may produce the physical torture and the lingering death **Mr. Smith** endured.

308. After the **Assaulting Officers** physically assaulted **Mr. Smith** and left him in a catatonic and comatose state, Defendants employed the use of the TCC/Placement Solitary Confinement cell with constructive and actual knowledge of **Mr. Smith's** severe injuries and diminished neurological function, and used that condition to further their goal of covering up the true nature of the beatings and **Mr. Smith's** deteriorating medical condition by falsely claiming he was suicidal, thereby depriving **Mr. Smith** of the necessary medical treatment he required for his objectively serious medical needs.

309. Defendants denied **Mr. Smith** access to adequate medical treatment that could have saved his life and interfered with the efforts of others to provide medical assistance to **Mr. Smith** while he was in their custody, with deliberate indifference to **Mr. Smith's** serious medical needs and in violation of his rights under the Eighth Amendment and Fourteenth Amendments to the United States Constitution.

310. Despite being aware that **Mr. Smith** had been brutally assaulted twice by Correction Officers prior to his death and was exhibiting extreme symptoms of a severe head or brain injury or other serious medical conditions, and despite being actually aware of a substantial risk of serious harm including death to **Mr. Smith** if they failed to act, the **Medical Defendants** were deliberately indifferent to **Mr. Smith's** objectively serious medical condition in that they only gave a cursory, superficial and fleeting visual check of **Mr. Smith** when he was brought to the infirmary after the beatings before approving him as fit for transfer to TCC/Constant Watch solitary confinement.

311. The **Medical Defendants** were deliberately indifferent to **Mr. Smith's** objectively serious medical condition in that they failed to

74

examine and treat **Mr. Smith** upon his presentation to the infirmary and in TCC/Constant Watch solitary confinement despite the fact that: (a) **Mr. Smith** showed clear signs of a neurological injury and/or cognitive deficit; (b) it would be readily apparent to a layperson that **Mr. Smith** had difficulty breathing and was exhibiting other symptoms of a neurological injury and/or cognitive deficit; (c) **Mr. Smith** was unresponsive to verbal stimuli; (d) **Mr. Smith** had involuntarily, urinated, defecated, and vomited on himself; (e) **Mr. Smith** had numerous bruises, scratches, and abrasions all over his body; and (f) **Mr. Smith** was unable to physically stand, walk, or make voluntary movements.

312. By virtue of their licensing and training, the **MedicalDefendants** were consciously aware of the serious nature of **Mr. Smith's** injuries. Nonetheless, Defendants ignored, refused, and denied medical care and treatment for **Mr. Smith's** life-threatening injuries; prevented **Mr. Smith** from receiving timely and necessary medical care and treatment;was complicit in and/or was a direct participant in the cover-up of the subject beating; knowingly drafted and filed false medical and injury reports; gave false sworn statements in an effort to cover-up evidence ofthe **Assaulting Officers'** excessive use of force and other misconduct; failed to report what they saw and heard to local, state and/or federal authorities; destroyed physical evidence; prevented others from truthfully documenting and/or photographing **Mr. Smith's** injuries; and were otherwise deliberately indifferent as set forth above.

313. Defendants intentionally ignored, failed to intervene, or otherwise failed to provide proper medical treatment to **Mr. Smith** with the intent of inflicting serious bodily harm and even death upon **Mr. Smith** and/or acted so recklessly as to create a substantial as well as certain

risk of serious bodily harm or death to **Darrell Smith.** All Defendants acted with deliberate indifference, knowingly disregarding, and ultimately taking advantage of the serious physical condition of **Mr. Smith.** Had Defendants intervened, **Mr. Smith** would not have died.

314. Upon information and belief, the individually named Defendants have been involved in similar incidents prior to and after August 23rd through August 26th, 2019, for which no corrective action has been taken against them, including but not limited to the incident involving **Mr. Smith** described above.

315. The individual Defendants were part of an entrenched culture of violence and deliberate indifference to medical needs by officers and healthcare workers towards residents and prisoners and their misconduct was part of a widespread practice at the **NJDOC, NJDOH, STU, ADTC,** and **UCHC,** which, although not expressly authorized, constituted a custom or usage of which Defendants' immediate supervisors as well as administrators of the **NJDOC, NJDOH,** and **UCHC** were aware, including but not limited to **Hicks, Royce, Brewer, Ghinassi, White, and John/Jane Does 1-20.**

316. **UCHC,** through its officers and employees, acting under the pretense and color of law, deliberately implemented a pattern and practice of delaying treatment, inadequately staffing facilities, hiring unqualified personnel, and failing to adequately train personnel to cut costs and maximize profits. **UCHC,** implemented its policies with deliberate indifference to their known, obvious, and proven consequences for patients: serious injury and death resulting from delayed, denied, and improper treatment.

317. **UCHC's** policies and practices created an atmosphere allowing medical providers to fail to provide, refuse, and delay medical treatment,

ignore emergent medical issues, fail to document and review medical records, fail to communicate with other physicians and medical personnel, and fail to adequately evaluate and address the objective serious medical needs of residents such as **Mr. Smith**, was and is deliberate indifference to **M**r. Smith's constitutional rights, and violates the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution and Article I, Paragraph 12 of the Constitution of the State of New Jersey.

318. The **NJDOC** and **NJDOH**, permitted, tolerated, and were likewise deliberately indifferent to the consequences of **UCHC's** profit-maximizing policies, of which they knew or should have known at the time of **Mr. Smith's** death. By pursuing, permitting, tolerating, and sanctioning persistent and widespread policies, practices, and customs pursuant to which **Mr. Smith** was abused, neglected, and killed, Defendants deprived **Mr. Smith** of his rights secured by the Constitution of the United States of America and has damaged him thereby.

319. **Mr. Smith** suffered and died because he was not provided adequate medical care. Defendants' failure to provide **Mr. Smith** with basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in a civilized society.

320. The conduct of Defendants in the instance was so grossly incompetent, inadequate, and excessive it shocks the conscience, was intolerable to fundamental fairness, and was maliciously and sadistically used to cause further harm to **Mr. Smith.**

321. The **NJDOC** and **NJDOH's** indifference to the implications of **UCHC's** policies, practices, and customs on residents of the **STU** and **ADTC** was a proximate cause of **Mr. Smith's** injuries, death, and Plaintiffs damages.

322.  As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, as well as the **NJDOC, STU, ADTC** and **UCHC's** custom, policies and practices of delaying and failing to provide adequate medical care to residents, and their failure to supervise, train, and discipline their Correction Officers and medical staff, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

<u>**COUNT X**</u>
<u>**Supervisor Liability – § 1983 and Common Law**</u>

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

323.  The **Supervising Defendants**, including **Royce, Sgt. Rodriquez, Lt. Estrada, Lt. Costeiro, Sgt. Orange, Nwachukwu, Patel, John Does 1-20,** and **Jane Roes 1-20**, were the immediate supervisors and/or supervisory personnel at the **STU** and/or **ADTC** with oversight responsibility for the training, instruction, supervision, and discipline of the **Assaulting Officers** and **Medical Defendants** on August 23rd to August 26th, 2019.

324.  These Defendants were either present during both assaults, participated in the attacks, had actual knowledge of the assaults, **Mr. Smith's** rapidly deteriorating medical condition, and the denial of medical care to **Mr. Smith**, <u>or</u> were personally involved in the coverup, alteration and concealment of evidence, alteration of **Mr. Smith's** medical records, intimidation of witnesses, and coercing of Correctional and medical staff to falsify, alter, and conceal official reports and **Mr. Smith's** medical records.

325.  At all times alleged herein, Defendant **Brewer,** as **UCHC's** highest medical authority, along with **Ghinassi, Morris, White, Nwachukwu,** and **Patel**

were responsible for supervising the **Medical Defendants** to ensure **Mr. Smith's** had timely access to appropriate medical treatment on August 23-26, 2019, but failed to do so.

326. As supervisory personnel, Defendants owed a duty of care to **Mr. Smith** to prevent the conduct alleged, which foreseeably caused his torture and beating death. This duty was breached.

327. Despite prior knowledge of pattern and practice and/or of the specific measures taken in this case against **Mr. Smith**, these Defendants failed to take preventive and remedial measures to guard against the constitutional violations committed by all individually named Defendants herein. Had Defendants taken appropriate action, **Mr. Smith** would not have been tortured and killed. The failure to act by the **Supervising Defendants** considering their level of knowledge constitutes reckless, willful, and wanton, intentional misconduct entitling **Mr. Smith** punitive damages.

328. Defendants acted with deliberate indifference to the conditions posing a substantial risk of serious harm to **Mr. Smith** by failing to supervise the **Assaulting Officers**, **Supervising Defendants**, and **Medical Defendants**, and in conspiring with them, planning, observing, gaining knowledge of and/or failing to intervene or prevent the horrific acts visited upon **Mr. Smith** despite having ample opportunity to do so.

329. The failure of these Defendants to train, supervise and discipline the **Assaulting Officers** and **Medical Defendants**, amounted to gross negligence, deliberate indifference, or intentional misconduct which directly caused the deprivations suffered by **Mr. Smith** and Plaintiffs.

330. The **NJDOC** and **UCHC**, as employer of Defendants, are vicariously responsible for their wrongdoing under the doctrine of Respondeat Superior and the New Jersey Tort Claims Act, <u>N.J.S.A.</u> § 59-2-2, et seq.

331. As a direct and proximate result of Defendants' misconduct and abuse of authority detailed above, as well as the **NJDOC, STU, ADTC,** and **UCHC's** custom, policies and practices of failing to supervise, train, and discipline their Correction Officers and medical staff, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

### COUNT XI
### (Negligent Hiring, Training, Supervision, & Retention

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

332. Defendants **NJDOC, NJDOH, Hicks,** and **Royce** were responsible for the recruiting, hiring, retention, training, and ongoing supervision of the **Assaulting Officers** and **Supervising Defendants** on August 23rd through August 26, 2019.

333. Defendants **UCHC, Ghinassi, Brewer, Morris,** and **White,** were responsible for the hiring, retention, training, and ongoing supervision of **Nwachukwu, Patel, Paden, Guida, Konamah, Naidoo, Fleurantin,** and **Jane Roes 1-20,** the Medical Defendants responsible for the care, treatment, and diagnosis of **Mr. Smith** on August 23rd through August 26, 2019.

334. The **NJDOC** and **UCHC** Defendants had a duty to properly ascertain the fitness of the **Assaulting Officers, Supervising Defendants,** and **Medical Defendants** to become Corrections Officers, physicians, nurses, and other health care professionals before they were hired, and had a duty to properly train and supervise the individual Defendants to ensure they did not violate the constitutional rights of citizens, including **Mr. Smith** but failed to do so.

335.  The **NJDOC** Defendants and **UCHC** Defendants knowing of the medical needs of **Mr. Smith** and with deliberate indifference to such needs, failed to properly determine the fitness of the **Assaulting Officers** and **Supervising Defendants** to be hired as Corrections Officers, physicians, nurses, and other health care professionals, and failed to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of medical care to **Mr. Smith** which is consistent with the standards of medical care in the State of New Jersey as a whole, thereby endangering the **Mr. Smith's** health and well-being in violation of rights secured to **Mr. Smith** and those similarly situated by the Eighth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of New Jersey.

336.  Defendants **NJDOC** and **UCHC** knew or should have known that the **Assaulting Officers, Supervising Defendants,** and **Medical Defendants** were not qualified to act as Corrections Officers for the **NJDOC** and as physicians, nurses, and other health care professionals for **UCHC,** and had a duty to take reasonable and appropriate steps to ensure that the **Assaulting Officers, Supervising Defendants,** and **Medical Defendants** would not act unlawfully.

337.  The **NJDOC** and **UCHC** Defendants were aware of other incidents that should have alerted them to the potential unlawful conduct of the **Assaulting Officers, Supervising Defendants,** and **Medical Defendants,** but failed to take reasonable steps to ensure that these Defendants would act lawfully.

338.  The violent beating death of **Mr. Smith,** the inhumane treatment he received after the beatings, and the failure to provide him with medical care for his serious medical needs are not isolated events. They are part

of a pattern of incidents of similar illegal use of excessive force, inhumane and illegal treatment of residents and inmates, and the denial of medical care for serious medical needs by **NJDOC** Correction Officers and **UCHC's** Medical Providers, and it is neither the first nor the last such incident that resulted in death. In fact, as previously stated, these failures and abhorrent practices have been and are now the object of both substantial litigation, media attention, and government investigation.[5]

339. These horrific incidents were the direct result of systemic deficiencies in the hiring, retention, training, supervision, and discipline of **NJDOC** Correction Officers and **UCHC's** medical staff, including the individual named Defendants, that began long before the vicious and deadly assaults on **Mr. Smith** and continue to this day. These violations, committed by one or more agents, servants, employees, or officers of Defendants, affected an unlawful seizure and unlawful use of force upon **Mr. Smith** that resulted in his premature death.

340. Despite prior knowledge of pattern and practice and/or of the specific measures taken in this case against **Mr. Smith**, Defendants failed to take preventive and remedial measures to guard against the constitutional violations committed by all individually named Defendants herein. Had Defendants taken appropriate action, **Mr. Smith** would not have been tortured and beaten to death.

341. Defendants created an unreasonable risk of harm to **Mr. Smith** by negligently hiring and retaining, and by failing to adequately supervise, train, control or otherwise monitor the actions of its employees.

---

[5] Specifically, due to widespread instances of abuse at Edna Mahan Correctional Facility, several law makers have called for Commissioner Hicks to resign due to his failure to implement policies and procedures to prevent abuse by correction officers at **NJDOC** facilities.

Specifically, Defendants were negligent for failing to adequately train its employees regarding the provision of medical attention to residents who they knew or should have known were brutally assaulted and sustained severe head injuries.

342. As a direct and proximate result of Defendants' custom, policies, and practices of negligently hiring and retaining, failing to supervise, train, and discipline their Correction Officers and medical staff, and their failure to take the appropriate steps to ensure the **Assaulting Officers**, **Supervising Defendants**, and **Medical Defendants** did not act unlawfully, which resulted in the misconduct and abuse of authority detailed above, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT XII
## § 1983, N.J.C.R.A., N.J.S.A. 10:6-2
## New Jersey Constitution - Special Relationship
## All Defendants

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

343. The New Jersey State Constitution, Article 1, ¶1 guaranteed **Mr. Smith** the substantive due process right to be free from state-created dangers.

344. **Darrell Smith** is deceased as the result of a homicide.

345. **Mr. Smith** was vested with certain state-created interests protected by the State's Due Process Clause, including the right to be free from physical, legal, or psychological abuse.

346. At all times relevant, Defendants had a special relationship with **Mr. Smith**, which imposed upon Defendants an affirmative duty to care

for and protect him under the New Jersey State Constitution, Article I, ¶1, substantive due process right. Defendants breached that duty by taking affirmative steps which placed **Mr. Smith** at imminent and foreseeable risk of legal danger and harm.

347. Defendants failed to ensure the safety and well-being of Mr. Smith, and arbitrarily and capriciously deprived **Mr. Smith** of his due process rights in the absence of any countervailing state interest, thus proximately causing substantial and unnecessary physical, emotional, financial, psychological, and/or psychiatric harm as a result.

348. Defendants' actions and omissions were a substantial departure from the exercise of reasonable professional judgment, practice, and standards, and amounted to deliberate indifference to **Mr. Smith's** rights and welfare. The actions and inactions that resulted in this harm include but are not limited to the failure to protect **Mr. Smith** from the unlawful use of excessive force, cruel and unusual punishment, and the failure to provide **Mr. Smith** with prompt and adequate medical treatment for his serious medical needs.

349. Defendants acted with callous and willful disregard for M**r. Smith's** safety by allowing a dangerous and/or wrongful condition which led to his injuries and death.

350. **Mr. Smith's** substantive due process rights were clearly established constitutional rights at the time of Defendants' acts and omissions, and a reasonable individual would have known that their acts and omissions would violate these clearly established constitutional rights.

351. The foregoing actions and inactions of Defendants resulted in **Mr. Smith** being deprived of constitutionally protected interests without

due process of law, which was a substantial factor leading to, and proximate cause of, the physical, emotional, developmental, financial, psychological, and/or psychiatric harm Plaintiffs have suffered.

352. Defendants' acts were done in knowing violation of **Mr. Smith's** legal and constitutional rights and caused **Mr. Smith** excruciating physical injuries, conscious pain and suffering, mental pain and suffering and emotional distress, and death. By virtue of the foregoing, Defendants deprived **Mr. Smith** of various rights protected by Fourteenth Amendment Due Process Clause and the New Jersey State Constitution, Article I, ¶1.

353. The physical, emotional, psychological, and/or psychiatric harm and death **Mr. Smith** was foreseeable, and directly, and proximately caused by Defendants' unconstitutional acts and omissions.

354. As a direct and proximate result of Defendants' conduct and abuse of authority detailed above, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT XIII
### (Violation of the New Jersey Civil Rights Act – N.J.S.A. 10:6-1 & 2)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

355. Defendants, under color of statute, ordinance, reputation, custom and usage have deprived and caused **Mr. Smith** to be subjected to the deprivations of rights, privileges and immunities secured by the New Jersey Constitution and law of the State of New Jersey, including his right to liberty, his right to be secure as a person against unreasonable searches and seizures, his right to be free from unlawful detention, his right to

85

privacy, and his right to freedom of association secured to his by the New Jersey State Constitution.

356. Defendants, acting under color of law, intentionally deprived **Mr. Smith** of civil rights by, inter alia, using unlawful and excessive force against him, denying him medical care for his serious medical needs, unlawful detention, failing to intervene to prevent the unlawful use of excessive force against him, conspiring and agreeing to violate his civil rights, and violating his right to privacy.

357. Defendants' acts were done in knowing violation of **Mr. Smith's** legal and constitutional rights and caused **Mr. Smith** excruciating physical injuries, conscious pain and suffering, mental pain and suffering and emotional distress, and death.

358. Defendants' deprivation of **Mr. Smith's** civil rights violates the New Jersey Constitution and give rise to **Mr. Smith's** claims for redress under N.J.S.A. 10:6-1 et seq.

359. Based on the aforesaid conduct, Defendants, acting under color of law, deprived, and interfered with the exercise or enjoyment by **Mr. Smith** of the rights guaranteed to him by the New Jersey Constitution including, but not limited to: a) The right to enjoy and defend life and liberty; b) The right to pursue and obtain safety and happiness; c) The right to due process of law; d) The right to equal protection of the laws; e) The right to any other natural and unalienable right retained by the people; f) The right to privacy; and g) The right to be free of cruel and unjust punishment.

360. As a direct and proximate result of Defendants' conduct and abuse of authority detailed above, **Mr. Smith** and Plaintiffs sustained the

injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT XIV
### 42 U.S.C. § 1983 - Violation of First Amendment
### (Against All Defendants)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

361. Defendants deprived **Mr. Smith** of the rights secured to him by the United States Constitution.

362. The brutal and deadly attack on **Mr. Smith** in retaliation to him muttering under his breath and stating to Powell that "You can't go into my room and just take stuff out of my room" and for defending himself against accusations of theft, was in violation of **Mr. Smith's** right to free speech and expression, as guaranteed by the First as applied to States through the Fourteenth Amendments to the United States Constitution.

363. Defendants' actions were, in whole or in part, unlawfully motivated by their hatred and anger against **Mr. Smith a**nd in retaliation for **Mr. Smith's** minimal objection to being called a "thief" and a "f. t" and being subjected to vilest of insults.

364. In depriving **Mr. Smith** of these rights, Defendants acted under color of state law.

365. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

## COUNT XV
### (Negligent and Intentional Infliction of
### Emotional Distress – All Defendants)

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

366.  When Defendants brutally assaulted, tortured, injured, unlawful detained, and denied **Mr. Smith** medical care for his serious medical needs, which ultimately killed him, Defendants acted intentionally or recklessly with deliberate disregard of a high degree of probability that emotional distress will follow.

367.  Defendants' conduct was extreme and so outrageous in character and degree as to go beyond all possible bounds of decency, and their conduct was so atrocious, it is utterly intolerable in a civilized community.

368.  As a direct and proximate result of Defendants' conduct and abuse of authority detailed above, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

**COUNT XVI**
**(Wrongful Death & Survivorship)**

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

369.  The actions and inactions of all Defendants caused the death of **Darrell Smith**.

370.  The actions and inactions of all Defendants caused experienced excruciating conscious pain and suffering over a six-day period, and ultimately the death of **Darrell Smith**.

371.  As a direct and proximate result of Defendants' conduct and abuse of authority detailed above, **Mr. Smith** and Plaintiffs sustained the injuries, harms, and losses set forth in the preceding paragraphs and in Count One of this Amended Complaint.

## COUNT XVII
## Punitive Damages-Individual Defendants

Plaintiffs adopt and re-allege the allegations set forth above as though fully set forth herein.

372. The acts of the individually named Defendants as set forth herein, were willful, wanton, malicious and oppressive, to entitle the Plaintiffs to an award of punitive damages against Defendants in their individual capacities.

**WHEREFORE**, Plaintiffs respectfully prays that this Court:

a.   Assume jurisdiction over this action;

b.   Award Plaintiffs actual damages, expenses, and other economic losses;

c.   Award compensation damages for injury, conscious pain and suffering, mental anguish, and emotional distress, in an amount to be determined by the enlightened conscience of an impartial jury;

d.   Award punitive (exemplary) damages against the individual Defendants, to the extent permitted by law, and award fees and expenses;

e.   Declare that Defendants violated **Mr. Smith's** rights under the United States Constitution;

f.   Award attorney's fees, pursuant to 42 U.S.C. §1988 and any other applicable provision(s) of state and federal law, and costs of suit; and,

g.   Award such other and further relief as the Court deems just and proper.

## DESIGNATION OF TRIAL COUNSEL

**PLEASE TAKE NOTICE** that TRACEY C. HINSON is hereby designated as trial counsel in the above-captioned litigation for the firm of Hinson Snipes, LLP.

<u>JURY DEMAND</u>

**PLEASE TAKE NOTICE** that the Plaintiff demand a trial by jury as to all issues so triable.

<u>NOTICE OF UTILIZATION OF TIME-UNIT BASIS</u>

**PLEASE TAKE NOTICE** Plaintiff intend to utilize the time-unit basis for calculating unliquidated damages in Plaintiff' closing statement to the jury and the Court.

<u>DEMAND FOR A "LITIGATION HOLD"</u>

Plaintiffs demand that each Defendant protect and preserve: (1) any and all documents and electronic files, including emails and textmessages, that refer or relate to **Darrell Smith**; (2) any and all trainingmaterials created or used by the **NJDOC, NJDOH, STU, ADTC**, and **UCHC**, between 2010 to the present; (3) any and all General Orders promulgated by the Defendants between January 1, 2010 the present; (4) the correction manualin effect during the times set forth in this Complaint; (5) all investigative files including internal affairs files that refer or relateto any incidents involving **Darrell Smith** or any the Defendants or any andall other matters at issue in this litigation; (6) all videos, recordings,statements, relating to **Darrell's Smith's** death; and (7) all criminal investigative files, including recommendations for criminal charges. If there is any policy or procedure to automatically destroy documents or electronic files, including emails, after a specified time to immediatelysuspend said policy and procedure until the conclusion of this case.

90